In the Matter of Robert B. CURTIS et al.,
Petitioners,

v.

Martin L. TOZER, Sheriff of the City of St.
Louis, and William Boeger, Warden of the
Municipal Jail, City of St. Louis, Respondents.

In the Matter of Louis FORD, Ian Grand,
Benjamin Goins, Roberta Tournour, Taylor Jones, Kenneth Lee and Ronald Glenn,
Petitioners,

v.

Martin L. TOZER, Sheriff of the City of St.
Louis, and William Boeger, Warden of the
Municipal Jail, City of St. Louis, Respondents.

In the Matter of Michela GRAND, Daniel
Pollack, and James Peake, Jr., Petitioners,

v.

Martin L. TOZER, Sheriff of the City of St.
Louis, and William Boeger, Warden of the
Municipal Jail, City of St. Louis, Respondents.

Nos. 31777–31779.

St. Louis Court of Appeals.

Missouri.

Jan. 15, 1964.

Robert E. Wilson, Jr., Robert L. Witherspoon, Clyde S. Cahill, Jr., Joseph S. McDuffie, Wyvetter Hoover Younge, Emanuel Williams, Robert E. Ratermann, Margaret Bush Wilson, St. Louis, for petitioners in Nos. 31777, 31778.

Wyvetter Hoover Younge, St. Louis, Billy Jones, East St. Louis, Ill., for petitioners Michela Grand, Daniel Pollack and James Peake, Jr.

Wayne L. Millsap, John P. Montrey, Wm. M. Howard, St. Louis, for respondents .

PER CURIAM.

Original proceedings in habeas corpus. Petitioners seek their release from detention by the respondent Sheriff and the respondent Warden who hold the petitioners in compliance with certain orders of the circuit court following an adjudication by that court that petitioners were guilty of criminal contempt. The sentences and fines imposed vary among the 19 petitioners and will be fully set out later herein.

The circuit court had issued an injunction pertaining to certain activities at or near the Jefferson Bank and Trust Company in the City of St. Louis, and the contempt citations arose out of alleged violations of that injunction. These alleged violations occurred upon different dates and involved different petitioners on each date. Thus, our No. 31,777 encompasses the 9 petitioners who are alleged to have first violated the injunction; No. 31,778 refers to the 7 petitioners who are alleged to have next committed contemptuous acts; and

No. 31,779 encompasses the petitions for habeas corpus filed by the 3 alleged contemnors whose acts, in point of time, last occurred.

It seems wise to place those facts applicable to all 3 consolidated files in some sort of chronological perspective. The petitioner Curtis wrote a letter dated August 14, 1963 to the Jefferson Bank and Trust Company which he signed "Chairman of CORE." The first paragraph of that letter reads as follows: "As a result of our conversation last week and the report given by Rev. Charles Perkins and me, the Saint Louis Committee of Racial Equality voted to take direct action against Jefferson Bank if four full time Negroes are not hired in clerical or teller positions within two weeks." Under date of August 27th, the bank replied in a letter signed by its attorney in which it stated reasons for rejecting the proposal that it hire 4 Negro employees within the time stated in Curtis' letter. Briefly put, these were that it did not need 4 additional employees to do the work it had; that it did not have applications from 4 qualified Negroes seeking such employment; that it was unwilling to discharge other employees to make room for these 4 Negro employees; that to do so would in itself be discrimination, rendering the demands in violation of the Fair Employment Practices Act of the City of St. Louis. The course of events is illustrated by a paragraph in that letter stating: "The bank has now been informed, through the local press, that your organization intends to take 'direct action' against the Jefferson Bank from 4:00 to 6:00 p. m. on Friday, August 30th. This 'direct action' has been described by you to include sit-ins, stand-ins and lie-ins which may interfere with the conduct of the business of the bank during critical hours of its operation." The letter concluded by urging CORE not to hold such demonstrations.

Seeking to avoid what it considered to be the harmful effect of such demonstrations, the bank made a verified application on August 29th to the circuit court for a tem-

porary restraining order. The style of the proceedings in which all of the orders herein referred to were entered is of some importance. It reads:

"JEFFERSON BANK AND
 TRUST COMPANY,
a corporation,

"–vs– 57945–E

"ROBERT B. CURTIS, WILLIAM L. CLAY, CHARLES R. OLDHAM and MARIAN OLDHAM, LUCIEN RICHARDS, RICHARD DALY, WALTER HAYS, REV. CHARLES PERKINS, NORMAN SEAY, HERMAN THOMPSON, MELVIN WEST, Individually and as representatives of a class known as St. Louis Committee of Racial Equality."

The temporary restraining order was issued and the defendants ordered to show cause on September 26th why a temporary injunction should not be granted. The Sheriff's return shows that on August 30th his office served a copy of this temporary restraining order upon the petitioners Curtis, Clay, Marian Oldham, Richards, Perkins, Seay, and Thompson. The return also recites the service upon 3 other persons not herein petitioners, and that he also delivered copies to " * * * eleven unknown persons (John Doe) located in the vicinity * *" of the bank.

The temporary restraining order required the defendants to "desist and refrain" from the following acts until the hearing of and ruling upon the order to show cause:

"(a) Physically hindering, obstructing, interfering with, delaying, molesting or harassing other persons desiring to enter plaintiff's banking premises, from entering said premises for the purpose of conducting their business with plaintiff or for any other purpose.

"(b) Congregating or loitering individually or in groups inside plaintiff's banking premises and therein engage in

any acts or conduct of whatsoever character which interferes with, intimidates, harasses, hinders and annoys plaintiff's employees in the performance of their duties or other persons in the conduct of their business with plaintiff or which in any way interferes with the proper and normal conduct of plaintiff's banking business.

"(c) Physically hindering, obstructing, interfering with, intimidating or in any other manner preventing customers or plaintiff and other members of the public from having the usual and customary access to tellers' windows located in plaintiff's banking premises or access to any other department or portion of said banking premises wherein plaintiff conducts its banking business."

The temporary restraining order required a bond in the amount of $10,000.00 and the records of the court show this bond posted and approved. The injunction bond need not herein be set out, but will be specifically referred to later in connection with the petitioners' contentions that it was fatally defective.

We pass now to a consideration of the nine applications consolidated in 31,777. On the 29th of August when the bank filed its verified petition for the temporary restraining order, the court caused the petitioner Charles R. Oldham to be notified. He appeared before the court and, being an attorney, entered his appearance as attorney for the St. Louis Committee of Racial Equality. The court, by agreement with Oldham and the bank's attorney, set a hearing on the restraining order for 10 a. m., August 30th. At that hearing the petitioner, Raymond Howard, an attorney and also a member of the St. Louis Committee of Racial Equality, entered his appearance on behalf of petitioners Charles and Marian Oldham, Curtis, and also on behalf of 3 others not now petitioners.

The verified petition for the citation for contempt recites the application for a re–

straining order and the entry of appearance by Oldham and that by Howard. It further states that the court had issued a restraining order, the bond had been posted, and Howard advised that the restraining order was in full force and effect by 4 p. m. on August 30th. It then reads as follows:

"7. That at approximately 4 o'clock P.M. August 30, 1963, certain of the defendants appeared at plaintiff's place of business accompanied by more than one hundred persons, including children, and acting in concert and under the direction and supervision of the defendants herein named, sang, paraded, chanted and shouted in and around plaintiff's place of business, locked arms in front of the entrance to plaintiff's place of business, entered in and upon plaintiff's place of business and did then and there walk in, sit in and lie in the lobby of plaintiff's place of business so that the customers of the plaintiff were prevented, hindered and delayed from having access to the tellers' windows at plaintiff's bank and congregated and loitered individually and in groups forcefully and unlawfully inside plaintiff's banking premises, all in violation of the Temporary Restraining Order of this Court entered as aforesaid."

The petition for the citation then alleges that the petitioners were each personally served with a copy of the restraining order or, in the alternative, had notice of that order by having it read to him or her; that these petitioners intentionally violated the restraining order even though they had full and complete knowledge of the order; that acts which where performed by petitioners were accomplished while the petitioners had full knowledge that those acts constituted a violation of the restraining order; and that the petitioners' acts were for the deliberate purpose of "defeating" the restraining order and constituted a "direct, willful and deliberate violation" of that order. The prayer was that a citation for contempt be issued, directing the petitioners

Curtis, Clay, Oldham, Mrs. Oldham, Richards, Perkins, Seay, Thompson and Howard to appear on September 3, 1963 and show cause why they "* * * should not be punished for said contempt and why your petitioner should not recover its costs and expenses herein and in its behalf, including attorney's fees to be allowed by this Court, and why the Court should not make such other orders and give such other relief as may be just and proper in the premises." This citation was issued and the Sheriff's return shows it was executed on the 31st day of August by "* * * attaching and taking into my custody the following persons listed herein, Marian Oldham, and Herman Thompson, Robert Curtis, William L. Clay, Charles Oldham, Lucien Richards, Rev. Charles Perkins, Norman Seay and Raymond Howard * * *."

It appears from the judgment that the hearing set in the circuit court for September 3rd was postponed to September 4th due to a hearing to be held on the 3rd before this court on a petition for habeas corpus filed by the petitioners Seay, Perkins, Richards, Charles Oldham, and Curtis. These petitioners had not given bond as had the other petitioners and were being held in jail pending the hearing of September 3rd. On September 4th, the hearing on the citation was again postponed due to an application for a writ of prohibition filed in this court. That matter being disposed of by the filing of the mandate of this court denying the writ, the causes were passed by consent until September 9th. On the 9th, the hearing was laid over until September 23rd.

On the 11th of September, the circuit court ordered separate notices of the contempt proceedings that had been filed that day and served on each of the petitioners. These notices were not signed by the court and did not state any definite time or place where the petitioners were to appear. However, the court's records show that they were ordered returnable on September 23rd. On September 18th, the court entered an

order appointing "* * * Wayne L. Millsap to prepare and file for the approval of the court and service * * *" on the petitioners a notice of contempt proceedings instituted against them which was to be returnable September 23rd. These notices were prepared and the docket entry on the 23rd shows registered mail receipts from the petitioners and/or their attorneys of record of service of these notices. The Sheriff's return also shows service of the notices of the 18th upon each of the petitioners. The notices of the 18th ordered the petitioners to appear in "Division No. 2, Circuit Court of the City of St. Louis, State of Missouri, Twelfth and Market Streets, St. Louis, Missouri, at 10:00 a. m. on September 23, 1963, and show cause why you should not be punished as for criminal contempt." The notices of the 18th and of the 11th are otherwise identical. Each recites the restraining order and contains the following language: "You are hereby charged with willful disobedience of said Restraining Order, lawfully issued, in the following particulars, and with full knowledge and notice of said Restraining Order." The particulars therein referred to are set forth and are the same in each set of notices. These consist of 4 paragraphs charging that the petitioner named in the notice: (1) conspired to cause others to violate the restraining order; (2) directed, controlled, supervised and planned the demonstration so as to cause the violation of the restraining order; (3) having the right to direct, control, supervise and plan the activities of the St. Louis Committee of Racial Equality; failed to so direct, control, supervise, and plan those activities as to cause the violations of the restraining order to cease; and (4) that the petitioner aided, abetted and counseled others to violate said restraining order by engaging and participating in the violations.

The trial began on September 23rd and continued from day to day until its conclusion on October 3rd. The court took the matter under advisement and indicated it would enter its judgment on the 24th of October.

While the recitals contained in the findings of fact and judgment differ somewhat as to each petitioner, there are certain findings that are common to many of the petitioners and other findings common to all of them. All 9 petitioners were found to have been served with a copy of the restraining order prior to the time when the demonstrators took any steps to stand in front of the bank doors or enter into the bank premises. All of the petitioners except Howard, Richards, and Charles Oldham were found to have been present at a meeting which took place on the parking lot adjacent to the scene of the demonstration where they were informed by the petitioner Howard of the contents of the restraining order and advised by him to comply with that order. The petitioners Marian and Charles Oldham, Curtis, and Richards were also found to have been personally represented by Howard at the hearing on Friday, August 30th, when the restraining order was issued and delivered to Howard at about 1:55 p. m. on that day.

The manner in which these petitioners were found to have willfully disobeyed the restraining order varies somewhat. In this regard, the findings as to Richards, Perkins, Clay, Curtis and Seay are the most extensive. They are identical and read as follows:

"It is further found that defendant, Rev. Charles Perkins, with full knowledge and notice, as aforesaid, and acting in concert and participation with and aiding and abetting one or more of the persons named as defendants in the aforementioned Jefferson Bank and Trust Company vs. Robert Curtis, et al., did willfully disobey and violate said restraining order by:

"(1) Conspiring with others to violate said Restraining Order by appearing on the 30th day of August, 1963, at the Jefferson Bank and Trust Company, 2600 Washington Avenue, St. Louis,

Missouri, with a crowd of more than one hundred persons, including children, and then and there singing, chanting, parading, shouting, and milling about in and around said Bank premises, and causing others to do so; conspiring with others to cause said crowd, or part of them, to lock arms in front of the entrance to the Bank premises so as to bar entry to and exit from said Bank; conspiring with others to cause said crowd, or part of them, to enter said Bank and sit in, lie in and otherwise obstruct the lobby of said Bank so that customers were prevented, hindered and delayed from having access to tellers' windows and otherwise transacting their lawful business; conspiring with others to cause said crowd of persons, or part of them, to congregate individually and in groups unlawfully inside said Bank.

"(2) So directing, controlling, supervising and planning, while said Restraining Order was in force, as a representative of the St. Louis Committee of Racial Equality with the right to direct, control, supervise and plan the activities of said Committee, as to violate said Restraining Order by causing members of said Committee and others: to sing, parade, chant, mill about and congregate in and around said Bank; to enter said Bank and sit in, lie in, and otherwise obstruct the lobby of the Bank, preventing, hindering and delaying customers from access to tellers' windows and other portions of the premises; to bar entry to and exit from said Bank by locking arms in front of the entrance; and to congregate and loiter individually and in groups unlawfully inside said Bank.

"(3) Failing, while said Restraining Order was in force, as a representative of the Committee aforesaid, with the right to direct, control, supervise and plan the activities of said Committee and its members, and knowing that members of said Committee were vio-

lating said Restraining Order, to so direct, control and supervise said activities as to cause said violation to cease and desist.

"(4) Aiding, abetting and counselling others to violate said Restraining Order by engaging and participating in the conduct aforesaid.

"It is further found, adjudged and decreed that the aforesaid acts and conduct constitute offenses against the majesty of the law and the dignity and authority of this Court.

"It is further found, adjudged and decreed that defendant, Rev. Charles Perkins, is guilty of willful disobedience of said Temporary Restraining Order, and is punishable as for criminal contempt."

The petitioner Thompson was not found to have disobeyed the restraining order as stated in paragraph 4 of the findings set out above. The petitioners Charles Oldham, Marian Oldham and Howard were not found to have disobeyed the restraining order as stated in paragraphs 2 and 4.

The fines and sentences imposed by the court vary among the petitioners. Each of the petitioners was assessed one-ninth of the costs. The petitioner Curtis was sentenced to 270 days in jail and assessed a fine of $1,000.00; Mrs. Oldham, Thompson and Howard each received 60 days and a fine of $500.00; Richards received a sentence of 90 days and a fine of $500.00; Charles Oldham, 90 days and a fine of $1,000.00; Perkins was sentenced to 180 days and a fine of $500.00; Clay, 270 days and a fine of $1,000.00; and the petitioner Seay was sentenced to 90 days and a fine of $500.00.

The applications to this court for habeas corpus followed the events summarized above and those later herein summarized relating to those applications consolidated in 31,778 and 31,779. We issued the writs and, in compliance therewith, the respondents brought the petitioners before us. We released the petitioners on bond and set the

hearing for the 12th of November, granting counsel leave to file their pleadings and suggestions before that date. The hearing before this court consisted of offering in evidence the exhibits, transcripts and other matters that were before the trial court. These we received subject to the objections that were made during the contempt proceedings in the circuit court. The respondents have objected to the consideration by this court of the transcripts and evidence introduced at the proceedings in the circuit court on the ground of relevancy. Their theory is that this court is bound by the recitals of the judgment entered and cannot look to the facts. Following the hearing, counsel again requested time to file their suggestions and we granted them leave to do so. The last of these was filed in this court on November 26, 1963.

It is necessary to look at the pleadings to determine the issues these proceedings present for our determination. The writs having been issued, the applications for habeas corpus pass out of the cases and the returns to the writs and the traverse thereof form the issues. State ex rel. Burtrum v. Smith, 357 Mo. 134, 206 S.W.2d 558; Label v. Sullivan et ux., 350 Mo. 286, 165 S.W.2d 639. In this connection, it should be noted that the answers filed by the 19 petitioners are not in compliance with the provisions of Section 532.-320 RSMo 1959, V.A.M.S., or of Rule 91.28, V.A.M.R. Both the statute and the rule require the answer to be on the oath of the petitioner. The answer in 31,777 was jointly filed on behalf of the 9 petitioners whose applications for writs of habeas corpus were consolidated therein. The same is true of the 7 petitioners whose applications are consolidated in 31,778, and of the 3 petitioners whose applications are encompassed within 31,779. In each of these 3 joint answers, the verification is by the attorneys for the petitioners. Verification by attorney for the petitioner has been held not to be in compliance with the statute, Gugenhine v. Gerk, 326 Mo. 333, 31 S.W.2d 1, and to result in the allegations of the return being taken as true. Ex parte Davis, 333 Mo. 262, 62 S.W.2d 1086, 89 A.L.R. 589. However, the situation in the instant cases is analogous to that in Label v. Sullivan, supra. In that case, petitioner failed to file any pleading traversing the return. Pointing out that it is the law in this state, Ex parte Bass, 328 Mo. 195, 40 S.W.2d 457, that a habeas corpus matter may be heard on the petition alone if the parties join in so submitting it, the court in Label v. Sullivan, supra, held that respondent therein had waived the petitioner's failure to traverse the return by raising no point about it and by joining issue on the petition, return, and an agreed statement of facts. Certainly the same is true in the instant proceedings. The respondents have not raised any point regarding the verification of the answer and, in fact, have joined issue upon it by having requested and received our leave to file a joint reply to each joint answer. We hold the respondents have waived any objection to the form of the verification of the answer and have joined issue thereon.

The reply which we granted respondents leave to file is merely a general denial of the allegations of the answer. It follows that, due to the waiver of the deficiencies of the answer as above noted, the issues for our ruling are encompassed within the respondents' returns and petitioners' traverse thereof as found in their joint answers.

The returns filed by the respondents state that the Sheriff took custody of the petitioners pursuant to the commitment orders issued by the circuit court and had transferred custody of the petitioners to the Warden when served with our writs. True copies of the commitment orders were attached to each of the returns filed by the Sheriff. As agreed by counsel, the return filed by the Warden did not include any such orders but reference was made therein to the orders attached to the Sheriff's returns.

The answers present a far more complicated picture. This for the reason that

the petitioners evidently assumed that whatever matter was contained within the joint answer filed in one of these three cases applies equally to all the petitioners. Of course, this is not so. The joint answer filed by each of these groups of petitioners applies only to that group. Equally confusing is the fact that when a point is stated in one answer and therein divided into sub-points, some of the sub-points will not appear in the other answers although they contain the same contention. However, giving the joint answers the liberal reading and construction we think the high purpose of the writ requires, it is possible to determine certain matters which are common to all the answers even though the matter may not be expressed in the same language or expounded at the same length and detail in such answer. These we will deal within our consideration of the applications consolidated in 31,777. Our rulings thereon will also dispose of those issues with respect to 31,778 and 31,779. These matters are: (1) the application being for civil contempt, the circuit court lacked jurisdiction to try the petitioners for criminal contempt; (2) the petitioners' contentions with regard to the right of this court in a habeas corpus proceeding to go behind the recitals in the judgment and commitment to determine whether there was present a lack of jurisdiction in these cases owing to the facts thereof; (3) the restraining order was void for lack of service and for other reasons to be set out when this point is herein ruled; (4) the contention that the indemnifying bond was defective; (5) defects in the attachment order render it void; (6) that the circuit court lacked jurisdiction due to the existence of a labor dispute within the meaning and interpretation of the Federal statutes relating to labor relations; and (7) the contentions that the punishment adjudged by the circuit court constitutes cruel and unusual punishment within the meaning and prohibition of the I, V, VI, VIII, and XIV Amendments of the Constitution of the United States and of the §§ 8, 9, 10, 18a, and 21 of the Constitution of Missouri, although of what article of that Constitution those sections are from was not given. Presumably petitioners refer to Article I.

In addition to these matters common to all three files the petitioners whose applications are consolidated into 31,777 also advance certain contentions with regard to the necessity for and the propriety of the appointment of the special counsel appointed by the court to assist in the presentation of this case.

It is first necessary to delineate clearly the particular offense with which we are here dealing. The petitioners contend that the circuit court lacked jurisdiction to try them for criminal contempt and to find them guilty of such offense because the application for the contempt citation and the entire conduct of the trial show that these proceedings were, in fact, for civil contempt.

 It has been said that contempts logically arrange and divide themselves into four classes: civil and criminal, direct and constructive or indirect. Ex parte Clark, 208 Mo. 121, 106 S.W. 990, 15 L.R.A.,N.S., 389. A direct contempt is one that occurs in the presence of the court or so near as to interrupt its proceedings. If the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court, a direct contempt may be punished summarily. It is so provided by rule in this state (Rule 35.01(a), V.A.M.R.) and was the law prior to the adoption of that rule, Ex parte Clark, supra; and see cases collected Mo.Digest, Contempt, ☜6. Constructive or indirect contempt arises from matters not transpiring in court but which go to degrade or make impotent the authority of the court or to impede or embarrass the administration of justice. State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S.W. 79; Holt v. McLaughlin, 357 Mo. 844, 210 S.W.2d 1006; Ex parte Clark, supra; and see cases cited Mo.Digest, Contempt, ☜2. The procedure in cases of constructive or

indirect criminal contempt which may not be punished summarily is set forth in Rule 35.01(b), V.A.M.R.

 The line of demarcation between criminal contempts and those that are civil in nature is indistinct and confusing. 17 C.J.S. Contempt § 5(2); 12 Am.Jur. Contempt, Sec. 6. For all practical purposes Rule 35.01(b), V.A.M.R., governing criminal contempt actions in this state is the same as Rule 42(b), 18 U.S.C.A., dealing with the same matter in the federal practice. It has repeatedly been held that in actions for criminal contempt brought under the federal rule technical pleadings are not required. Bullock v. United States, 6 Cir., 265 F.2d 683. A strict compliance with the rule is not necessary. United States v. United Mine Workers of America, 330 U.S. 258, 1. c. 295–301, 67 S.Ct. 677, 1. c. 696–700, 91 L.Ed. 884. The same result was reached in Osborne v. Purdome, Mo., 244 S.W.2d 1005, 1. c. 1012, 29 A.L.R.2d 1141, where it is said that there is no fixed formulae for contempt proceedings which are sui generis and do not require technical accuracy. Criminal contempt embraces acts committed against the majesty of the law and that the primary purpose of punishment for criminal contempt is the vindication of public authority. Ex parte Clark, supra; see also Mo.Digest, Contempt, ☞3 —Criminal Contempt, ☞4—Civil Contempt.

 The petitioners rely upon the language of the application or motion for attachment which they contend illustrates this proceeding to be for civil contempt. There are at least two answers to such an argument. The first is that there are contempts in which both elements appear, civil and criminal. State ex rel. Chicago, B. & O. R. Co. v. Bland, 189 Mo. 197, 88 S.W. 28. In Limerick v. Riback, 204 Mo.App. 321, 224 S.W. 45 at 1. c. 46, criminal contempt was held applicable to acts in violation of an injunction. The court held:

"* * * It is true that civil contempt proceedings are for the purpose of protecting the property rights of private parties, or for the benefit of the opposing party in a civil action, but it is equally well established that there may be in a civil case to protect private property rights a contempt in a punitive sense to vindicate the supremacy of the law and to punish for a completed act of disobedience."

That is true in the instant case for there can be no doubt that the Jefferson Bank and Trust suffered pecuniary loss as a result of these demonstrations at the same time the dignity and authority of the circuit court and the majesty of the law were likewise suffering. It should be noted that the application charges a "willful and deliberate" violation of the restraining order and that the prayer of the application requests the court to order the petitioners to show cause why they "* * * should not be punished for said contempt *and* why your petitioner should not recover its cost and expenses herein * * *" (emphasis supplied). In United States v. United Mine Workers, supra, the petitioner for contempt charged a "willful and deliberate" violation of the restraining order and prayed that the contemnors be "punished." The court then stated that the use of the word "punished" could well be held adequate notice of a proceeding for criminal contempt, referring to Moskovitz, Contempt of Injunction, Civil and Criminal, 43 Col.L.Rev. 780, and also held that the use of the term "wilfully and deliberately" indicates an intention to proceed as for criminal contempt. The petitioners are incorrect in their contention that the application for the contempt citation illustrates the civil character of this proceeding. In cases 31,778 and 31,779, the motions instituting those proceedings do not contain any requests for civil relief.

 The second answer to such a contention is that the language used in the application or petition can hardly be said to be determinative of the essential character of the proceeding. Once the application or motion is ruled on, it passes out of

the case. The essential question is whether the petitioners had notice of and understood they were to be tried for criminal contempt. There can be no doubt of that matter in the instant case. The notice of September 11th and that of the 18th, served upon each of the petitioners, clearly called upon them to "show cause why you should not be punished as for criminal contempt." These notices also contained the statement that the petitioners' actions constituted "offenses against the majesty of the law and the dignity and authority of this court." Moreover, these notices were read aloud in open court to each petitioner. This and the other requirements of Rule 35.01, supra, were strictly complied with. No one can read this transcript and come to any conclusion other than these petitioners and their counsel clearly understood the nature of this proceeding to be for criminal contempt.

The petitioners rely upon Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797. No comment is necessary as to the vitality of that decision in view of the United Mine Workers decision for the case does not support the petitioners' contentions. In Gompers the court held that one of the more important tests to determine criminal as distinguished from civil contempt was the character and purpose of the punishment. Gompers v. Buck's Stove & Range Co., 221 U.S. at 441, 31 S.Ct. at 498, 55 L.Ed. 797. It was cited for this ruling in the United States v. United Mine Workers, 330 U.S. at 297, 67 S.Ct. at 697–698, 91 L.Ed. 884. In Carder v. Carder, Mo.App., 61 S.W.2d 388, 389, the court distinguishes criminal and civil contempt by quoting with approval from the Gompers case as follows:

"' "* * * The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in Re Nevitt [C.C.A.] 117 F. [448] 451 [54 C.C.A. 622]. 'He carries the keys of his prison in his own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

"' "On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience." ' "

The petitioners did that which they had been commanded not to do. Their acts were not threatened; their disobedience was a thing already accomplished. The imprisonment and fines to which they were sentenced was in no way coercive but was intended to and did operate solely to vindicate the majesty of the law and punishment for the petitioners' completed acts of willful and deliberate disobedience. The petitioners had notice that they were to show cause why they should not be punished as for criminal contempt and were warned in the notice served upon them and read to them in open court that the offenses with which they were charged constituted offenses against the majesty of the law and the dignity and authority of the court. It follows that what is here involved are acts of criminal contempt.

The petitioners' next contenton is that in a habeas corpus proceeding testing the legality of the restraint arising from a conviction for criminal contempt, this court has authority to go behind the recitals in the findings and examine the evidence. They further contend that, upon doing so,

we will find the evidence will not support the recitals. Based upon their allegations in this regard, the petitioners urge that the trial court did not have jurisdiction to render the particular judgments it entered. The respondents' position is that this court is conclusively bound by the recitals in the judgment and that in this proceeding we cannot inquire beyond whether the committing court had jurisdiction over the subject matter and over the persons of the petitioners. The respondents also contend that this court is forbidden to look behind the recitals in the judgment by the provisions of Rule 91.35, V.A.M.R.

Ex parte Clark, supra, involved what was specifically held to be a constructive or indirect criminal contempt. After reciting the rule that there was no appeal in such cases, the court held (106 S.W. 990, 1. c. 997):

" * * * no appeal lies and no writ of error may go. State ex rel. [Chicago, B. & Q. R. Co.] v. Bland, supra. Absent such remedy, what was said in that case (page 207 of 189 Mo., page 30 of 88 S.W.) is applicable here, to wit, that where no statutory right of appeal exists or writ of error lies courts having superintending control have been astute and diligent in granting relief by inspecting records under writs of certiorari or habeas corpus. Ex parte O'Brien, supra [127 Mo. 477, 30 S.W. 158]; State v. Leftwich, 41 Minn. 42, 42 N.W. 598; In re Watts & Sachs, 190 U.S. 1, 23 Sup.Ct. 718, [719], 47 L.Ed. 933."

It is with respect to the extent of our inspection of the records of the proceedings before the circuit court that this court must necessarily concern itself.

The Supreme Court of this state in the case of Ex parte Creasy, 243 Mo. 679, 148 S.W. 914, 41 L.R.A.,N.S., 478, specifically held that in a habeas corpus proceeding arising out of an indirect criminal contempt proceeding, it had authority to go behind the recitals in the judgment and to make the inquiries and determinations the petitioners would have this court make. Its ruling and a portion of the rationale therefor are to be found in the following excerpt from the opinion (148 S.W. 914, 1. c. 916 [1], 41 L.R.A.,N.S., 478):

"(1) 'I. First, I do not agree that the judgment of the court nisi in contempt proceedings is conclusive in this court upon the facts, when issues as to the facts are made upon the hearing of the writ of habeas corpus. The writ of habeas corpus has a peculiar constitutional sanctity, which this court will not permit to be frittered away by any judicial ascertainment of the facts, except the ascertainment made by the court trying the case under this peculiar writ of right. Our constitutional provision as to writ of habeas corpus has a deep-seated meaning. It was lodged there for the sole purpose of affording one deprived of liberty the right to have the cause of his detention investigated, and, too, whether such detention was upon the judgment of a court, or was upon some other alleged authority. To say that the committing court in contempt proceedings can absolutely conclude an investigation of the facts by the tribunal hearing the writ of habeas corpus is giving the judge whose court has been the target of an alleged contempt more power than our Constitution ever contemplated. If such be the law, the only thing left for the court hearing the writ of habeas corpus is to determine whether the judgment and writ of commitment are regular upon their face. If they are, then the prisoner must be remanded, it matters not how flagrantly the offended judge may have disregarded the facts. Judgments in contempt proceedings are in a measure different from other judgments. They are judgments entered by one not altogether disinterested. They may not be cool, dispassionate judgments, but may be shaded by the feelings of one pre-

siding over a court thought to have been outraged by the conduct of a person in attendance upon such court. Human liberty is too sacred under our Constitution to say that under a judgment emanating from such a source *the actual facts are not for review in the court trying the writ of habeas corpus.* Mere jurisdiction of the person and the subject-matter is not and should not be the test of a valid judgment in a contempt proceeding. This is the test in ordinary judgments, but out of respect for constitutional provision with reference to the writ of habeas corpus many courts have gone further, and, as to contempt judgments, have said that, in order to sustain the contempt judgment, it must not only be shown that the court had jurisdiction of the person, and of the subject-matter—i. e., contempt—*but that it must be shown that under both the law and the facts the particular judgment could be sustained.* A learned discussion of this exact point is found from the pen of Davidson, P. J., of the Texas Court of Criminal Appeals, in the case of Ex parte Duncan, 42 Tex.Cr.R. 661, 62 S.W. 758.'" (Emphasis ours.)

It will serve no useful purpose to herein set out the lengthy quotation from the Texas case cited. It appears in the Creasy opinion and can be read there or in the original version. It should suffice to say that opinion contains an extensive and comprehensive review of the law on the point from various states of the union. It is well worth reading not only for the cases cited, but for the soundness of its reasoning. For the latter purpose, the following quotation from the Creasy case is of such importance that its length must be overlooked (148 S.W. 914, 1. c. 920, 41 L.R.A., N.S., 478):

"[2] 'We are firmly of opinion that, as to contempt judgments, such judgments can be attacked in habeas corpus for (1) want of jurisdiction over the person; (2) want of jurisdiction over subject-matter; and (3) want of jurisdiction in the particular case owing to the facts thereof, although the first two requisites are fully met. In other words, as said by the Texas court "nor can the court make contempt of that which is not contempt; and every attempt to do so would be in excess of authority or jurisdiction, as much so as if the court had no authority or power to punish for contempt, either in relation to the person or subject-matter. There must be contempt in order to justify punishment for that offense." Proof that there was in fact no contempt should avoid the judgment. We are aware that there are generalizations in the books, which appear opposed to this doctrine, but, if we are to give full vitality to the constitutional writ of habeas corpus, such should be the law. If not, the hearings upon writs of habeas corpus become mere perfunctory proceedings in which we determine a mere paper case; i. e.: (1) Has the court jurisdiction of the person and subject-matter, and (2) has the court (whether truly or falsely) recited facts enough to constitute contempt? Such a hearing would be far from the hearing so forcefully put by our Brother Lamm, in Clark's Case, supra, when he said: "Wherefore, when the great writ goes down—a writ whose origin is beyond the dawn of English history, whose final and triumphant establishment was a landmark in the evolution of civil liberty, making the hearts of its lovers leap for joy—to the prisoner the doors of jails open, he comes into court with his shackles dropped, and *the cause of his imprisonment, the very marrow of it, is laid bare to the utmost verge and minutiae permitted by written law."* The italics are ours. Prison doors are but temporarily opened, if under this great and benign writ we are bound by the mere ipsi dixit of a judge finding for us the facts: The leaping of hearts for joy would only last long enough for the

prosecutor to read a false finding of fact in a well-written judgment, which finding made contempt wherein there was no contempt. There the "very marrow" of the cause of the imprisonment might be fully shadowed by a perverse finding of facts, which would prevent its being "laid bare." ' "

Seizing upon the language in the excerpt above set out regarding a contempt judgment as being one entered by a person not altogether disinterested and the possibility that such a judgment may be shaded by the outraged feelings of the judge in whose court the contempt occurred, the respondents contend such language constitutes the real basis for the decision. In support of that argument, the respondents cite Ex parte Howell, 273 Mo. 96, 200 S.W. 65, a case decided 6 years after the Creasy decision. We cannot agree. In the first place, such an argument totally ignores the real rationale for the Creasy case as stated in the excerpts set out herein. While we regret the length of those excerpts, we have nevertheless included them so that it might be clearly understood that the language respondents contend furnishes the basis for that opinion is but a crutch to the sound leg upon which that decision stands. In the second place, Howell and Creasy involved different classes of criminal contempt. In Creasy, the recitation was that the contempt took place in the court's presence. However, when this recital came before the court in the subsequent habeas corpus proceeding, the Supreme Court specifically held that the contempt involved was indirect or constructive, stating:

" 'In this case the commitment recited that the contempt occurred in the presence of the court, when, as a matter of fact, as shown by proof aliunde in controversion of the terms of the commitment, that the alleged acts were not in the presence of the court. * * * ' "

Accordingly, the Creasy case is not one involving direct contempt but was, in fact, a case of indirect criminal contempt as are the cases here involved, while the Howell case was, in fact, a case of direct contempt. Since the Howell case involved a type of contempt not involved in the instant case, the pertinence of that case to our inquiry can only be that by the opinion in the Howell case handed down some 6 years later, the Supreme Court of this state extended the rule announced in Creasy to cases involving direct contempts. The Howell case in no way affects the force and effect of the Creasy decision upon the conclusiveness of the recitals in the judgment in a case of indirect contempt.

However, even if the Howell and Creasy cases were not so distinguishable, we could find no merit in respondents' contention. A careful reading of the Howell opinion affords convincing proof that the rationale of that case is not the makeweight argument that the court is allowed to go behind the recitals of the judgment to avoid the unfairness that may arise from judicial passion and prejudice. The true basis for the Howell opinion is to be found in that portion of the opinion preceding the court's remarks upon which the respondents rely. There the court said (200 S.W. 65, 1. c. 68) :

"Absent the right of appeal, no opportunity for a full review of the proceedings is afforded, except by habeas corpus. Resort to the writ of certiorari, sometimes employed in other jurisdictions, will not afford relief because, as is not infrequently the case, the proceedings concurrent with and provocative of the judgment for contempt, are not preserved in the record, and hence cannot be brought up for review. By invoking the aid of habeas corpus, however, which is always construed in favor of the liberty of the citizen, an opportunity is afforded, in a case of the character here under consideration, to look beyond the commitment and its recitals into the evidence and circumstances upon which the court below acted, and determine therefrom, although jurisdiction of the person and

subject-matter be conceded, whether the court had authority to render the judgment, or generally whether the third essential to the court's right of action existed. * * * "

The rationale for the Howell decision is clearly the same as that for the Creasy decision.

However compelling Creasy may be, our decision that we are not bound by the recitals in the judgment does not rest solely upon that decision. In Osborne v. Purdome, Mo., 250 S.W.2d 159, (see also Osborne v. Purdome, Mo., 244 S.W.2d 1005, 29 A.L.R.2d 1141), the contempt did not take place in the presence of the court. Having been found guilty of contempt, Osborne brought his application for habeas corpus before the Supreme Court of this state sitting en banc. In the habeas corpus proceeding, the petitioner raised the contention that the evidence was insufficient. The Supreme Court reviewed the evidence and determined for itself the sufficiency thereof. Its action in that regard constituted a clear sub silentio ruling that it had authority in a habeas corpus proceeding to make such an inquiry and determination and was not bound by the recitals in the judgment.

In addition to the direct rulings of the point found in Creasy, supra, and in Osborne, supra, there have been numerous recognitions that such was indeed the law. See Holt v. McLaughlin, supra, 210 S.W. 2d 1. c. 1007 [4, 5], where the court, in speaking of all criminal contempt cases, stated " * * * a full review of such proceedings is afforded by habeas corpus. * * * " In the Howell opinion, supra, 200 S.W. 1. c. 69, the court refers to Ex parte Clark, supra, as "impliedly" endorsing this principle. As stated earlier herein, Clark involved a case specifically held to present indirect contempt. See also Threlkel v. Miles, en banc, 320 Mo. 1140, 10 S.W. 2d 953, 1. c. 956 [7], and Ex parte Devoy, 208 Mo.App. 550, 236 S.W. 1070, 1. c. 1072 [1], [2], where this court held:

"In Ex parte Creasy, 243 Mo. 679, 148 S.W. 914 [41 L.R.A.,N.S., 478], our Supreme Court established the proposition that the judgment of the circuit court committing a person for contempt is not conclusive upon the facts, but that such facts may be inquired into in the court of which the writ of habeas corpus issues."

Compare Ex parte Cloud, Mo.App., 18 S. W.2d 562, 1. c. 563.

This court's decision to go behind the recitals of the judgment finds support in logic and sound reasoning as well as in the case law referred to in the preceding portion of this opinion. For example, to rule otherwise would render useless the clearly stated requirements of Section 476.-140 RSMo 1959, V.A.M.S., and of Rule 35.01(b), V.A.M.R. The statute requires that where a person shall be committed for contempt " * * * the particular circumstances of his offense shall be set forth in the order or warrant of commitment." The rule requires that "Upon a finding of guilt the court shall enter an order reciting the essential facts constituting the criminal contempt and fixing the punishment." The appellate courts of this state have repeatedly held that the facts and circumstances constituting the offense, and not simply the legal conclusions of the court, must be recited not only in the judgment but also in the commitment regardless of whether the contempt arose out of conduct or action before the court or outside of its presence. Glenn v. Hendrix, Mo.App., 349 S.W.2d 532, 1. c. [2, 3]. If as respondents contend, there is no possibility of going behind the recitals of those orders, then there would be no reason for the statute and rule to so carefully require them to include the facts and circumstances of the contempt rather than the legal conclusions the committing judge draws therefrom. Neither would there be any purpose in the explicit enforcement of that requirement by the appellate courts of this state. Glenn v. Hendrix, supra. To the contrary, if respond-

ents be correct, it would seem that the conclusions of the committing judge would be clearly sufficient. They are not and this helps persuade us that our decision is soundly reasoned.

Another example of such persuasive matters is one mentioned in the Creasy case. It is that Section 532.320 RSMo 1959, V.A. M.S., seems to encompass controversy as to issues of fact. That section is the same as § 2468, R.S.1909, in force when the Creasy opinion was handed down, and reads:

> "The party brought before any court or magistrate, by virtue of any writ of habeas corpus, may deny the material facts set forth in the return, or allege any fact to show, either that his detention or imprisonment is unlawful, or that he is entitled to his discharge; which allegations or denials shall be on oath."

This language is substantially the same as that of Rule 91.28, V.A.M.R. In the Creasy opinion (148 S.W. 914, l. c. 920, 41 L.R.A., N.S., 478), the court relied upon the provisions of this section, stating: " * * * Furthermore, our statute (section 2468, R.S. 1909) seems to contemplate the practice for which we contend * * * " and pointed out that the petitioner in that case did so plead. So it is in the instant cases. The petitioners' pleadings in this case constitute complete denials of the material facts alleged in the return and, moreover, allege other facts by which petitioners contend their detention is unlawful and they are entitled to be discharged.

Still another example of persuasive argument why this court should not be bound by the recitals of the judgment was given in Creasy and is equally of force in the instant case. In that opinion the court said (148 S.W. 914, l. c. 920, 41 L.R.A.,N.S., 478):

> " 'If former adjudication in another habeas corpus proceeding will not estop a subsequent inquiry as to facts surrounding the detention of a citizen, why should it be said that the findings of fact made by the presiding judge of the court against which the offense of contempt was committed would forever seal the lips of a petitioning citizen from showing the facts surrounding the judgment committing him? If the high character of the writ under the Constitution is such as to preclude the doctrine of res adjudicata, so long as the petitioner is in custody, why should not the same rule apply to facts surrounding and entering into the particular judgment?' "

The respondents also contend that by Rule 91.35, supra, the Supreme Court has imposed a limitation on the courts of this state preventing inquiry into the recitals in the judgment. Rule 91.35, supra, is identical to Section 532.440 RSMo 1959, V.A. M.S. It is the same as § 2475, RSMo 1909 (in force when the Howell case was ruled), and § 5379, RSMo 1889 (in force when Creasy was decided). In the Howell case, it was held that the legislative branch of our government lacks the power to prescribe by statute limitations upon the judicial review of an adjudication of guilt in a criminal contempt proceeding. The respondents admit that this is true of a legislative attempt such as those embodied in § 532.440, supra, and in the previous enactments of that section in force when Howell and Creasy were ruled. However, they urge that Rule 91.35, supra, being a limitation by the judicial branch of government upon its own power, is not subject to the same attack and does, in fact, constitute a valid and enforceable limitation upon the judicial review of adjudication of guilt in criminal contempt proceedings. Again, there are several reasons why respondents' contention cannot be adopted by this court:

The first is that when it adopted Rule 91.35, supra, the Supreme Court of this state must be held to have done so with the previous judicial interpretations of the language contained therein clearly in

mind. As heretofore stated, the rule and the legislative enactments are identical. This language had been held in both Howell and Creasy not to prevent a judicial inquiry into the validity of the recitals in the judgment. By the use of that same language in the rule, the Supreme Court must have intended the same construction to be placed upon it and cannot be held to have intended to place limitations upon the judicial review of criminal contempt proceedings which it had previously found unwarranted, unconstitutional and unenforceable.

■ Another answer is that the rule making power of the Supreme Court of this state is limited to procedural matters. There can be no doubt but that, if given the interpretation the respondents seek to have us place upon it, this rule would affect substantive matters and thus be beyond the authority of the Supreme Court to promulgate. In spite of the fact that it must be held to have been cognizant of the limitation of its rule-making power, the effect of respondents' argument would be to hold the Supreme Court intended to make a rule affecting substantive matters and thus violative of that limitation upon its authority. We must refuse to make such an unwarranted and illogical assumption.

Finally, we think it well to keep clearly in mind the precise legal point upon which we are ruling. This decision does not change, alter or modify the field of inquiry in *every* habeas corpus proceeding. It is elementary that this decision must be read in the light of the circumstances of the cases we are ruling, i. e., cases involving indirect criminal contempts. We are in no way extending that rule to any other adjudication or imprisonment from which relief may be sought by habeas corpus. However, as the Howell case makes clear, the rule is the same in cases involving direct criminal contempt. The effect of our decision is that in habeas corpus proceedings brought by one found guilty of indirect criminal contempt, the court to which the application for the writ is made may go behind the recitals of the judgment and determine for itself the

accuracy of those recitals and their sufficiency to support the judgment rendered. Ex parte Creasy, supra; Osborne v. Purdome, supra. The reason it is permissible to do so in cases of this nature and why such latitude is not granted to the court considering an application for habeas corpus where the adjudication and imprisonment arises out of matters other than criminal contempt is clear and soundly reasoned. It is that in cases other than criminal contempt, the right of appeal is available. The very matters which the rule we have herein restated allows this court to go into can be reviewed in such cases without the necessity of resorting to habeas corpus. After having the benefit of such a review or having failed to seek such review, the inquiry, upon application for habeas corpus is properly limited to whether the court had jurisdiction over the person and over the subject matter. Lacking that opportunity to secure review in habeas corpus proceedings where the adjudication and imprisonment results from an act of criminal contempt, the inquiry of the court before which the application for habeas corpus is pending is extended to include a third matter; i. e., want of jurisdiction in the particular case owing to the facts thereof, although the first two inquiries be satisfied. Ex parte Creasy, supra; Osborne v. Purdome, supra. The distinction between the scope of inquiry in habeas corpus proceedings arising out of criminal contempt cases and those that arise out of other matters is dealt with in Sisk v. Wilkinson, 305 Mo. 328, 265 S.W. 536, 1. c. 538 [5]. Having due regard for the historic character and high purpose of the writ of habeas corpus and keeping firmly in mind the regard our system of law bears toward individual liberty, we can reach no other decision in matters of this nature. As it has been so aptly put (Ex parte Creasy, supra, 148 S.W. 1. c. 923, 41 L.R.A.,N.S., 478) "The Constitution guards the liberty of the felon with the same eagle eye that it does the infant and pure girl."

As was stated earlier herein, this court admitted into evidence at the habeas cor-

pus hearing before it the transcripts, exhibits and all other matters that were presented to the trial court. These we took subject to the objections made in the trial court. It would unduly extend the length of this opinion if we were to recite and pass upon each of the objections made during the course of these 3 trials. It is a gross understatement to say these objections were very numerous and the arguments advanced to support each of them were extensive. It suffices to state that in determining the factual situation shown by these transcripts and records, we have accepted the evidence properly admitted and have disregarded that which was properly objected to. We will state only that evidence bearing upon the recitals contained in the judgment entered as to each petitioner.

As to the first nine petitioners, whose applications are consolidated into 31,777, the facts show that the St. Louis Committee of Racial Equality had regular Sunday meetings. At such a meeting held on August 25, 1963, "direct action" at the Jefferson Bank and Trust Company was discussed with various types of direct action considered. It was formally voted that direct action would be taken against the bank and the actual planning for the demonstration would be done at a special meeting called for Thursday evening, August 29th. How the individual petitioners voted is not shown. At the meeting on August 29th, the petitioner Oldham advised them of the application for a restraining order filed in the circuit court. According to the witness Daly, Oldham explained what an injunction was and that for violation of it, "You could be arrested. That you could be fined or jailed." Mr. Oldham also informed them that the hearing on the motion was to be held on Friday morning, and secured a signed authorization from three of the petitioners (Mr. and Mrs. Oldham and Curtis) for the petitioner Howard to represent them. All the petitioners were present at this meeting with the exception of Howard. After Oldham had told them of the application for the injunction, had explained the possible

penalties for violation of the restraining order, and had recommended that if such an order be issued, it be obeyed, a motion was made and carried that a demonstration be held at the bank and that "Several persons were to link arms and stand in front of the doorway of the bank." The motion also included going inside the bank. At this same meeting, a plan was made whereby " * * any persons who were willing to be arrested, not knowing the outcome, but willing to do this to block the front door of the bank." By formal action of those present, Curtis was placed in complete charge of the tactics and strategy of the demonstration and Thompson and Richards were designated as captains and placed in charge of the picket lines.

On August 30th, the demonstrators met at the Wheatley YWCA. Under the direction of Curtis, they formed lines, marched to the bank, and began peaceful picketing which continued until about 5:05 or 5:10 p. m. At some time prior to or during this peaceful picketing, a sound movie was taken at the scene. A portion of this movie consists of an interview between a reporter and the petitioner Curtis. In the course of that interview the following question was asked and answer given:

" 'MR. CONDON: Mr. Curtis, do you expect to honor the bank's injunction with this demonstration?

" 'MR. CURTIS: Well, we haven't anything to say at all on this issue. We feel that sometimes, while there is an injunction, it is necessary to take extraordinary measures to remedy an extreme situation and I hope, of course, it won't be necessary to violate any Court injunction or even violate the law. But there are times when this becomes necessary and, of course, we hope this will not be necessary today.' "

At approximately 5:05 or 5:10 p. m. a meeting was held on a parking lot adjacent to the scene of the demonstration. This meeting is of importance for the undisputed testimony is that prior to the holding of this

meeting the demonstrators made no effort to block the doors of the bank nor to enter the bank. There had been a previous announcement that such a meeting would take place. One witness testified she was told of such a meeting during the picketing by the petitioner Richards who advised her attendance. Others stated they learned of such a meeting by "the grapevine" or in other ways they could not specifically describe. All the petitioners except Messrs. Oldham and Richards attended this meeting. The petitioner Curtis presided at this meeting and upon introducing Howard told those gathered on the parking lot to listen to him. All the witnesses who testified as to this matter were unanimous that the petitioner Howard advised the group that a restraining order had been issued and urged them not to block the doors or otherwise violate the injunction as to do so would subject them to possible fine and/or imprisonment. Curtis then called for a show of hands of those present who were willing to block the doors of the bank, thereby subjecting themselves to possible arrest. All present raised their hands except Howard. The gathering then dispersed, and some of the demonstrators in attendance went immediately to the front doors of the bank where they blocked the entrance by linking arms and standing in the doorway or standing so close together in the doorway no one could enter or by sitting in front of the doorway.

The testimony is clear that there were people who tried to get into the bank to transact business and could not get past the line of demonstrators. It is also clear that those who did enter the bank had extreme difficulty in doing so and that those who were inside the bank when the entrances were blocked had the same experience when they attempted to leave. There is no testimony that any one of these 9 petitioners linked arms, sat or stood in front of any of the doorways nor that any of them used their persons to physically block the entrances to the bank.

At about 5:25 or 5:30 p. m. the demonstrators first entered the bank itself. They marched around inside the bank; they congregated in front of the tellers' cages; they sang and clapped hands in unison; some sat on the floor and some lay down on the floor. While they were inside the bank, Mr. McConnell, an officer of the bank, read to them a copy of the restraining order and repeatedly asked them to leave the bank. The demonstrators stopped singing and clapping while McConnell read the restraining order to them, but after he asked them to leave the bank, started to sing and clap again. None of the demonstrators left the bank. At approximately 5:50 p. m. the petitioner Curtis came inside the bank, asked for the demonstrators' attention and upon getting their attention and securing quiet, announced that, "We will stay here until six o'clock and then we will go to the Wheatley YWCA."

When the demonstrators left the bank at about 6:00 p. m., a large number went to the Wheatley "Y" where Curtis and a Mr. Williams from East St. Louis complimented them on their courage, and Curtis announced a meeting of CORE for that Sunday evening.

All the petitioners with the exception of Thompson admitted they were served with a copy of the restraining order prior to the time the meeting was held on the parking lot. There was other evidence that all, including Thompson, were so served.

It will be helpful to consider the activities of each of these 9 petitioners. The petitioner Curtis was chairman of the St. Louis Committee of Racial Equality at the time of this demonstration. He presided at the regular meeting of that organization held on the 25th of August when "direct action" was voted against the bank. He also presided at the strategy meeting of the 29th of August, when it was voted to block the doors of the bank, to go into the bank, and for some of the demonstrators to be arrested. At this meeting the petitioner Oldham got Curtis to give Howard a "signed authorization" to represent him as an individual at the hearing on the issuance of the re-

straining order. Curtis was formally placed in charge of the entire demonstration, and the evidence of the witness Seay shows clearly that the other petitioners so understood. Curtis admitted this when he was asked, "Now, this entire operation was under your direction, was it not?" and answered, "Yes, it was." At the predemonstration meeting at the Wheatley "Y" Curtis gave instructions to the pickets, and during the demonstration he directed them. His interview with the reporter regarding, as he put it, times when violation of the law becomes necessary, has already been stated. This petitioner presided at the meeting on the parking lot and called for a show of hands to ascertain if there were any present who would subject themselves to possible arrest by blocking the doors of the bank. The evidence is that he held up his hand. At 5:50 p. m. the petitioner Curtis entered the bank and told the demonstrators to leave at 6:00 p. m. and also told them to reassemble at the Wheatley "Y". The demonstrators obeyed his instructions, and at the "Y" Curtis announced a meeting of CORE for that Sunday evening. The petitioner Curtis was asked if he was aware, before it ever occurred, that a sit-in or lie-in at the bank was a violation of the restraining order and answered, "Oh, yes, I was aware of that."

The evidence does not show the petitioner Clay to have been present at the meeting of the 25th, but he was present at the strategy meeting of the 29th of August. He was at the predemonstration meeting at the Wheatley "Y". He was present at the parking lot meeting where he also raised his hand when asked if there were any present who would subject themselves to possible arrest by blocking the doors of the bank. This petitioner stood on the corner of the sidewalk leading to the doors of the bank and motioned a group of pickets into the bank.

Mrs. Oldham was present at the meeting of the 25th and at the meeting of the 29th. At the latter meeting she authorized Howard to appear for her at the hearing on the issuance of the temporary restraining order. She was present also at the predemonstration meeting at the Wheatley "Y" and at the parking lot meeting where she raised her hand when the question was put regarding blocking the doors.

The petitioner Thompson is a former head of the St. Louis Committee of Racial Equality and was present at the meeting of the 29th when the motions to block the doors of the bank and to go inside it were carried. At this meeting he was made a captain in the demonstration and placed in charge of one of the picket lines. He was present at the meeting on the parking lot and raised his hand when Curtis asked for a show of hands on the issue of blocking the doors of the bank. He testified that he was aware that blocking the doors of the bank would interfere with its business.

Mr. Seay was present at both meetings held prior to this demonstration. He attended the meeting on the parking lot and was one of those who raised their hands when Curtis posed the question as to who would be willing to block the doors. He did go inside the bank but there is no evidence he joined in any of the activities there. It appears that he went into the bank and got 2 children who were participating in the demonstration and brought them outside. At one time, noticing that people were getting into the bank by going in back of the line at the door, this petitioner directed those in the line to back up so that the entrance would be more effectively blocked. Those in the line blocking the door obeyed his instructions.

The petitioner Richards, immediate past chairman of CORE, was present at the meeting of August 25th and also present at the meeting of the 29th. At the latter meeting he was appointed a "captain" in the demonstration and was in charge of one of the picket lines at the bank. He was also present at the predemonstration meeting at the Wheatley "Y". Richards was not present at the meeting on the parking lot, but he directed a demonstrator to attend the meeting. When the demonstrators were in

the bank, Richards was with them and participated in the singing and generally milled around inside the bank. He did not sit on the floor or block the doors of the bank. Some of the demonstrators had entered the bank still carrying the signs they had carried while on the picket line outside, and Richards directed them to take the signs outside and then come back.

The Rev. Mr. Perkins was present at the meeting held on the 25th of August and also at the meeting held on the 29th. He was not shown to have been present at the pre-demonstration meeting at the Wheatley "Y". He was present at the meeting on the parking lot and there raised his hand in response to the call by Curtis for a show of hands as to who would be willing to block the doors of the bank. This petitioner came inside the bank with the first of the demonstrators to do so and complained loudly about "police brutality" or "sheriff brutality." He milled around inside the bank and, using his arms, directed the singing, but did not sing nor clap hands nor sit on the floor of the bank.

The petitioner Charles Oldham was national chairman of CORE for a period of 5 or 6 years. He was present at the meeting of the 25th of August. He had entered his appearance as attorney of record for the St. Louis Committee of the Congress of Racial Equality on Thursday, August 29th. He went to the meeting of the 29th to advise the group that a petition for an injunction had been filed and explained what an injunction was and the possible penalties for violation of the injunction. He obtained authorization from four of those at the meeting for Howard to represent them as individuals. He also told the meeting that a hearing would be held on the request for a restraining order on Friday morning, and the uncontradicted evidence is that he advised those present against violating the injunction if it was issued. Mr. Oldham was not present at the predemonstration meeting at the Wheatley "Y" nor at the meeting on the parking lot. He never went into the bank nor did he participate in blocking the doors. There is no evidence that he gave any directions to anyone at the scene or acted in any manner that would cause them to violate the restraining order.

The petitioner Howard was present at the meeting held on August 25th but was not present at the meeting held on the 29th of that month. He had entered his appearance in the proceedings concerning the restraining order as attorney of record for both the Oldhams, for Curtis, and for some others not here petitioners. He was engaged in that proceeding on August 30th, and when it was over went to the scene of the demonstration. Howard spoke to the meeting held on the parking lot and told the group of the issuance of the restraining order and that they would violate it should they block the door, sit or lie in the bank, sing or do anything that would interfere with the business of the bank. The evidence is unanimous and uncontradicted that this petitioner spoke strongly against any violation of the restraining order. He went inside the bank on two occasions. The first was when he first learned the demonstrators were in the bank. He then went into the bank to make certain that no one he represented was in the bank. This was prior to the reading of the restraining order to all the demonstrators in the bank by Mr. McConnell, an officer of the bank. On this occasion he had a conversation with the bank's attorney and with Mr. McConnell. During this conversation he told them that the demonstrations might continue unless an agreement was reached on the bank employing Negroes. The second occasion was when he returned with Curtis at 5:50 p. m., and Curtis made his announcement about the demonstrators leaving at 6:00 p. m. Howard left the bank immediately after his conversation with Mr. McConnell and immediately after the announcement by Curtis. There is no testimony that this petitioner directed anyone at the scene of this demonstration or that he acted in any manner that would cause others to violate the restraining order.

It is readily apparent from the evidence stated above that there was ample evidence to substantiate the court's finding that the petitioners had been served with a copy of the restraining order prior to the time the demonstrators blocked the doors and entered the bank. It is equally apparent there is ample evidence to support the circuit court's finding that, together with many others not here petitioners, all of the petitioners except Howard, Richards, and Charles Oldham were present at the parking lot meeting. Actually the evidence is clear that Howard was present also and that petitioner so admitted. The same is true as to the finding that Howard there informed them of the issuance of the restraining order (they had already been served with a copy of that order) and advised them against any violation of that order. The evidence is that Howard specifically explained that to block the doors, enter the bank and sit or lie in the bank, to sing or otherwise interfere with the business of the bank was a violation of the restraining order. The petitioners Richards, Marian and Charles Oldham, and Curtis, were found to have been represented by Howard at the hearing on Friday morning, August 30, concerning the issuance of the restraining order. There is no question but that both of the Oldhams and the petitioner Curtis authorized Howard to appear for them. There is no evidence that Richards did so. The court's records do not so show and neither was there any testimony to that effect. However, we do not find this unsubstantiated finding to be of importance since the evidence is clear that Richards was personally served with a copy of the restraining order prior to his entry into the bank and prior to the time when any of the demonstrators first blocked the doors of the bank or entered the bank.

We pass now to a consideration of the specifications of the activities of these 9 petitioners which the circuit court found to constitute violations of the restraining order. Proceeding logically, it would seem that the degree of proof required to sustain the finding made would depend upon whether the contempt proceeding is regarded as criminal in nature. If so, then the guilt of the accused would require the same quantum of proof as in a criminal proceeding, i. e., beyond a reasonable doubt. Those jurisdictions in which contempt proceedings are regarded as quasi-criminal in nature require a standard of proof greater than a mere preponderance of the evidence but less than beyond a reasonable doubt. 12 Am.Jur., Contempt, Sec. 75. We are spared the difficulties attendant upon putting into words a degree of proof that would be between those poles. In Missouri, although we deny that such proceedings are criminal in nature, Osborne v. Purdome, Mo., 244 S.W.2d l. c. [8, 9] p. 1012, 29 A.L.R.2d 1141, we require that guilt be proved beyond a reasonable doubt. Osborne v. Purdome, Mo., 250 S.W.2d l. c. [11] p. 163.

Considering the burden of proof required and, having due regard for the extent of this court's review of the evidence as held earlier herein, this court's duty is to consider the evidence summarized above as to each petitioner. The question is whether that evidence supports the finding, beyond a reasonable doubt, that the petitioner acted as stated in the specifications found as to him or her. In so doing it is unnecessary to consider all the specifications found as to that petitioner. The purpose of the writ is to test the legality of the restraint. It follows that if the determination stated above is supported as to even one of the several specifications contained in the judgment entered as to a petitioner, then that petitioner is not illegally restrained and, as to that individual, our writ should be quashed. On the other hand, if not even one of the several specifications found as to a petitioner is sustained, beyond a reasonable doubt, by the evidence then that petitioner must be discharged.

The second specification of the findings of fact and judgment entered as to these nine petitioners finds that they directed, controlled, supervised and planned this

demonstration, while the restraining order was in force, so as to cause members of their organization and others to violate the restraining order by barring entry to and exit from the bank and by causing others to enter the bank. By the fourth specification these petitioners were found to have aided, abetted and counseled others to engage in the described activities violating the restraining order. There can be no doubt that such activities are punishable for contempt. This is the rule in Missouri. Osborne v. Purdome, Mo., 244 S.W.2d 1. c. (23) p. 1015, 29 A.L.R.2d 1141. See also 12 Am.Jur., Contempt, Sec. 7, p. 10, 11, 12 and 13; 17 C.J.S. Contempt § 33; 43 C.J.S. Injunctions § 263, a, c.

That portion of the second specification finding that these acts were caused by these petitioners while the restraining order was in force is fully supported by the evidence. The restraining order was issued at approximately 2:00 P.M., and none of the acts which these petitioners were found to have caused occurred until after 5:00 P.M., and after these petitioners not only had been served but had knowledge of the existence of the order through information given them by the petitioner Howard at the parking lot meeting.

■ The evidence clearly supports the finding that the petitioners Curtis, Clay, Seay, Perkins, and Richards are guilty beyond a reasonable doubt of criminal contempt under the 2nd and 4th specifications of the findings of fact and judgment entered as to those petitioners. The entry by the petitioner Curtis into the bank at 5:50 P.M. and his announcement therein concerning the meeting at the Wheatley "Y" at 6:00 P.M., was, in effect, a clear act of counseling, abetting and directing the demonstrators in the bank to continue their activities in violation of the restraining order for another 10 minutes. This in spite of this petitioner's own admission that he understood those activities were in violation of that order. Moreover, Curtis admitted that he had control of the whole demonstration and the evi-

dence is clear that the other demonstrators so understood and looked to him for direction and control. With respect to the petitioner Clay the evidence is that after the parking lot meeting, he stood on the sidewalk leading to the bank and directed a group of demonstrators into the bank. The petitioner Seay went into the bank and brought outside two children who were participating in the demonstration. He actively directed the demonstrators blocking the door to move back further against the door so that their unlawful activity could be made more effective. The petitioner Perkins directed the demonstrators as they sang inside the bank, he walked around in the bank with them, and he led the complaints against what he termed "police brutality" or "sheriff brutality." These are activities that clearly show his direction, control, supervision and planning was such as to cause others to violate the restraining order and to aid, abet and counsel them to do so. The activities of the petitioner Richards inside the bank as he joined the demonstrators as they sang and "milled about" is proof of his aiding, abetting, and counselling others to violate the restraining order by engaging in such activity. His activity in directing certain of the demonstrators who had entered the bank carrying signs to take the signs outside the bank and then return goes to the same issue as it does to prove this petitioner's direction, control, supervision, and planning were such as to cause others to violate the restraining order.

■ The evidence does not sustain the finding that the petitioners Thompson, Howard, Marian Oldham and Charles Oldham were guilty, beyond a reasonable doubt, of any of the specifications found against them.

■ All of these petitioners were found guilty of the first specification in that they conspired to violate the restraining order by appearing with a crowd of more than one hundred persons and, " * * * then and there singing, chanting, parading,

shouting and milling about in and around said bank premises. * * *" The general rule that a person can be guilty of contempt for conspiring to cause or bring about a contemptuous action is stated in 17 C.J.S. Contempt § 33. This rule is recognized in Missouri. Osborne v. Purdome, Mo., 244 S.W.2d 1005(23), 29 A.L.R.2d 1141; Middleton v. Tozer, Mo.App., 259 S.W.2d 80 1. c. 86. For an example of the same ruling from another jurisdiction, see Berlandi v. Commonwealth, 314 Mass. 424, 50 N.E.2d 210. But certainly no one could be held to be guilty, beyond a reasonable doubt, of a conspiracy because they "appeared" with a crowd of over one hundred persons. Yet that is the most the evidence shows as to these petitioners. These petitioners neither sang nor chanted, nor shouted at any place. Only Thompson can be held to have done any parading and that was done in a manner not forbidden by the restraining order. The balance of the first specification consists of findings that these petitioners conspired to cause this crowd or part of it to do acts forbidden by the restraining order. There are only two of these findings supported by any evidence at all. First is the finding that these petitioners conspired with others to cause this crowd, or part of it, to lock arms in front of the entrances so as to bar entry to and exit from the bank. The second is that they conspired to cause the crowd or part of it to go into the bank. The evidence is clearly deficient as to these findings. This is true even if we disregard the fact that the meeting of August 29th took place prior to the issuance of the restraining order and consider the action at that meeting where it was voted to block the doors and enter the bank. The petitioner Howard was not present at that meeting, and the uncontradicted evidence is that Mr. Oldham there recommended obedience to the restraining order. There is no showing that he later voted for the resolution to block the doors or in any way changed his recommendation nor acted in any manner to show his joining any conspiracy. The petitioners Thompson and Mrs. Oldham were present at the meeting of the 29th, but there was no evidence as to how they voted on the resolution. It is urged that attendance at the parking lot meeting and holding up their hands in response to Curtis' inquiry as to who would be willing to block the doors constitutes proof of these findings. However, there is no evidence that the matter forming the basis of the second finding, entering the bank, was discussed at the parking lot meeting. Charles Oldham was not present at the parking lot meeting. The petitioner Howard did not raise his hand, and the evidence is that he spoke earnestly against violating the restraining order. The only proof of these findings is as to the petitioners Thompson and Marian Oldham. This consists of proof they were present at the parking lot meeting and held up their hands. Such activity falls short of proving, beyond a reasonable doubt, these petitioners conspired to cause others to violate the restraining order.

The petitioner Thompson is the only one of these four petitioners to have been found guilty of the second specification. There is no evidence to sustain such a finding. The evidence as to the petitioner Thompson is that he was a captain and in charge of a picket line. There is no showing that those in the picket line violated the restraining order under Thompson's control, direction, supervision, and planning.

Each of these four petitioners were found to be guilty of the third specification. This specification alleges that, while the restraining order was in force, and having the right to direct, control, supervise and plan the activities of the St. Louis Committee of Racial Equality and its members, and knowing some of the members of that organization were violating the restraining order, these four petitioners failed " * * * to so direct, control, and supervise said activities as to cause said violation to cease and desist." We have grave doubts whether this specification complies with the clearly stated requirements of Sec. 476.140, supra,

and of Rule 35.01, supra., stated earlier herein. See Glenn v. Hendrix, supra, where it was held that the essential facts and circumstances constituting the offense and not the legal conclusions of the court must be recited in the judgment. We need not and do not rule the point, however, for even if we were to hold this specification obeys the statute and rule, there is no proof to substantiate such a finding.

Since none of these petitioners were found to have been guilty of the fourth specification, we need not discuss it. It follows that the petitioners Thompson, Howard, Marian Oldham, and Charles Oldham are illegally restrained and should be discharged forthwith.

■ The petitioners complain of the appointment of Wayne L. Millsap and John Montrey, plaintiffs' attorneys, as special prosecutors in the contempt proceedings. It is alleged that by said appointments petitioners were deprived of their rights to due process and equal protection of the laws as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States, the Constitution of the State of Missouri, Art. 1, Sec. 10, V.A.M.S. and the statutes of the State of Missouri, particularly Section 56.110 RSMo 1959, V.A.M.S. In support of this allegation these petitioners contend that the aforementioned Wayne L. Millsap had a personal, pecuniary, special and inconsistent interest in the outcome of the matter, and, therefore, petitioners were deprived of a fair and impartial trial; that Wayne L. Millsap's dual role in the case was inconsistent in that he served as attorney for the plaintiff, filed the petition for injunctive relief, secured the restraining order for the sole benefit of the bank, filed the application for citation for contempt seeking court costs, expenses and attorneys' fees, and that he was the son-in-law of Dillon Ross, President of Jefferson Bank and Trust Company. It was further alleged that said Wayne L. Millsap attempted to intimidate and coerce a sixteen year old witness, a member of the class sought to be prosecuted and promised her immunity, thus depriving petitioners of their constitutional rights to a fair and impartial trial, due process and equal protection of the laws under the Constitution of the United States. The answer of petitioners in cause No. 31,779 contained like averments with the exception of the last two above mentioned allegations.

At the hearing there was no evidence to support this last above mentioned charge or evidence of the relationship between Millsap and Dillon Ross, President of Jefferson Bank and Trust Company. All that appears from the record is that Wayne L. Millsap appeared throughout the proceedings before Judge Scott as the attorney for the bank, which also employed John Montrey. There was no evidence whatever of improper conduct on the part of either Mr. Millsap or Mr. Montrey. Both are respected members of the Bar of this State, and by reason thereof officers of the court bound to represent the court when called upon to do so. Under such appointment they are considered as representing the State' and not their private clients.

Under the New Jersey law it is expressly provided that in a criminal contempt case, the court may, in its discretion, appoint the attorney who represents the complaining party, unless it senses that unfairness may ensue. Department of Health v. Roselle, 34 N.J. 331, 169 A.2d 153; Whippany Paperboard Co., Inc. v. Local No. 301, United Paperworkers of America, C.I.O., et al., 11 N.J. 153, 93 A.2d 349. And in McCann v. New York Stock Exchange et al. (C.C.2d Cir.) 80 F.2d 211, Judge Learned Hand has this to say on the subject:

"* * * the court may proceed sua sponte without assistance of any attorney, as in the case of disorder in the courtroom; there can be little doubt about the kind of proceeding when that is done. But the judge may prefer to use the attorney of a party, who will indeed ordinarily be his only means of information when the contempt is not in

his presence. There is no reason why he should not do so, and every reason why he should; * * *."

In Osborne v. Purdome, Mo., 250 S.W.2d l. c., (1, 2) p. 160, this point was ruled.

The court thus stated:

"In State ex rel. Gentry v. Becker, 351 Mo. 769, 174 S.W.2d 181, 184, we held that a court could make such an appointment, saying: 'The court has the inherent power to punish for contempt and if it has also the inherent power to appoint or request a lawyer, as an officer of the court, to represent it or the state in the prosecution of the contempt proceeding, that is all the power the court reasonably needs for its own protection and for the due administration of justice.' * * *"

In the case at bar there are no allegations of fact in Respondents' answers to the return tending to show that the trial court abused its discretion in the appointment of Mr. Millsap and Mr. Montrey as special prosecutors, or that their constitutional rights were denied thereby, nor was there any evidence introduced at the hearing which tended to show any impropriety in the appointments. Section 56.110 RSMo 1959, V.A.M.S. is not applicable. That section of the statutes relates to criminal proceedings and provides that the court may appoint an attorney to replace the prosecuting attorney or his assistant where either is interested in the case being prosecuted or defended by reason of having been employed as counsel and such employment is inconsistent with the duties of his office, or where either shall be related to the defendant. The point urged has no merit.

These nine petitioners next contend the restraining order was void for two reasons. First, because the order served was not the order received by the sheriff and certified by the clerk. The second contention is that the restraining order served failed to recite approval of the bond. The petitioners have failed to cite any authority for either contention nor do they, in their brief, refer to any facts to support these contentions. An examination of the record shows that the restraining orders served were copies of and identical to the order entered by the court. In their joint answer petitioners state, "There are two alleged restraining orders in the Court's file." and incorporate by reference exhibits P3 and P4 which are the "Petition for Injunction" and the "Restraining Order." Their contentions with regard to the failure of the restraining order to recite the approval of the bond evidently arises from their confusion in regarding both of these documents as restraining orders. The "Restraining Order" issued on August 30th contains the following:

"Thereupon, comes the plaintiff by attorney, and presents to the Court its Injunction bond, conditioned according (sic) to law in the penal sum of Ten Thousand Dollars ($10,000.00), with Hanover Insurance Company as surety, and the Court having seen and examined the same, doth order that said bond be approved and filed, which is now accordingly done."

In their brief the petitioners seek to enlarge upon the matters contained in their answer and raise the contention that the restraining order is void because its provisions are " * * * vague, too broad, too indefinite and are unenforceable." As has been held herein, the issues are circumscribed by the return and the answer thereto. However, a reading of the restraining order will illustrate the fallacy of such an argument. That order is very definite in its terms, clearly proscribes certain specified acts and activities and is sufficient to give notice to anyone reading it what acts are forbidden. There is no merit to petitioners' contention the restraining order is void.

Petitioners in their returns attack the validity of the restraining order on the grounds that the indemnity bond was void in the following respects: (1) because it failed to indemnify all parties named in the

restraining order, (2) because (as to the Howard in 31,777, all seven petitioners in 31,778 and the three petitioners in 31,779), the petitioners were not named in the bond nor did the bond name a class to which they belonged, (3) the bond was not approved or signed by the judge, and (4) alterations were made on its face which rendered it ambiguous. These contentions will be considered in turn.

■ In the absence of any elaboration in petitioners' law memorandum it is difficult to understand the basis for the first contention. In its petition for an injunction the bank named as defendants Curtis, Clay, Charles Oldham, Marian Oldham, Richards, Cahill, Daly, Hays, Perkins, Seay, Thompson, and West, individually and as members of a class known as St. Louis Committee of Racial Equality. Cahill was immediately dismissed as a defendant with the result his name does not appear in the caption of the certified copy of the record regarding the granting of the restraining order, and it was crossed out in one place in the bond. The court's record named as defendants Curtis, Clay, Charles Oldham, Marian Oldham, Richards, Daly, Hays, Perkins, Seay, Thompson, and West. In the first paragraph of the bond the bank as principal, and Hanover Insurance Company as surety, bound itself to all of the original defendants, including Cahill. In the second paragraph all of the original defendants were named, but Cahill's name is crossed out. Since Cahill was not named in the restraining order, the inclusion of his name in the first paragraph of the bond is an obvious oversight, and should be regarded as a superfluity. Barrett v. Stoddard County, Mo.App., 183 S.W. 644; Rubelman Hardware Co. v. Greve, 18 Mo. App. 6. There is no merit to this contention.

The next contention is that the bond is void because the seven petitioners named in 31,778 and the three petitioners named in 31,779, were not named in the bond, nor was a class to which they belonged named.

The execution of a bond as a prerequisite to the obtaining of a restraining order is governed by Civil Rule 92.09, which reads:

"No injunction or restraining order, unless on final hearing or judgment, shall issue in any case, except in suits instituted by the state in its own behalf, until the plaintiff, or some responsible person for him, shall have executed a bond with sufficient surety or sureties to the other party, in such sum as the court or judge shall deem sufficient to secure the amount or other matter to be enjoined, and all damages that may be occasioned by such injunction or restraining order to the parties enjoined, or to any party interested in the subject matter of the controversy, conditioned that the plaintiff will abide by the decision which shall be made thereon, and pay all sums of money, damages and costs that shall be adjudged against him if the injunction or restraining order shall be dissolved."

This rule is the same as Section 526.070 RSMo 1949, V.A.M.S., except that restraining orders are expressly included.

■ Preliminarily, it may be stated that the requirement that a bond be posted before a restraining order or temporary injunction is issued is jurisdictional, and one issued without a bond is void. State ex rel. Becker v. Westhues, Mo., 286 S.W. 882; Ex parte Gounis, 304 Mo. 428, 263 S.W. 988.

The first part of petitioners' contention may be readily disposed of. These petitioners were charged with violating the restraining order some time after it had been issued. Obviously the bank could not be expected to know, and to name in its petition at the time it was filed, the names of all those who might subsequently violate the restraining order. The power of clairvoyance is not common, if it exists at all.

■ The second part presents a more difficult problem. The defendants named

in the bank's petition were sued as individuals and "as representatives of a class known as St. Louis Committee of Racial Equality." The caption of the restraining order similarly named them in their individual and in their representative capacity. However, in the bond, both in the first and second paragraphs, they are referred to only as individuals. Petitioner Howard in the first case, and all of the petitioners in the second and third cases, claim that the bond is void because (A) the named defendants were not described therein as the representatives of the class; and (B) because the bond did not indemnify "any party interested in the subject matter of the controversy," the phrase used in Civil Rule 92.09.

It is true that in the body of the bond the named defendants were not described as the representatives of the class. But the caption referred to them as "Curtis, et al. etc." This is a common and ordinary way of referring to the caption of the petition, and that, of course, described the named defendants as the representatives of the class. Furthermore, in the second paragraph of the bond it is recited that a temporary injunction had been issued against the named defendants "as by the record of said Court will fully appear." The court's record (the petition, and the order granting the restraining order) all make it clear that the named defendants were sued both as individuals and as representatives of the class.

In Franz v. Buder, 34 F.2d 353, 355, the Circuit Court of Appeals for the Eighth Circuit said that, "considerable liberality is exercised in construing designations of obligees in bonds, so long as the intent of the parties is clear." This court, in Stine v. Southwest Bank of St. Louis, Mo.App., 108 S.W.2d 633, held that the omission to properly designate a person as obligee on a bond would not render the bond void where the identity of the individual could be gathered from the whole instrument. In fact, a close reading of that case will disclose that the court went beyond the

bond itself, and examined the entire record to determine the correct name of the obligee. To the same effect see General Motors Acceptance Corp. v. Hutto, 136 S.C. 207, 134 S.E. 232, where the Corporation, which held a judgment against Hutto, was permitted to recover on a bond in which it was not named as obligee, but which referred to the judgment held by the Corporation. In the light of these authorities it would seem that the failure to expressly describe the named defendants in the bond as representatives of the class was a mere "mistake or clerical error" (Stine v. Southwest Bank, supra, 108 S.W.2d p. 635) which would not render the bond void.

The petitioners rely heavily on the case of Ex parte Dillon, Mo.App., 96 S.W.2d 1095. In that case the Springfield Court of Appeals interpreted the statute to require the bond to run not only to the parties named in the litigation, but also to persons interested in the subject matter of the action. A careful analysis of the present Rule discloses that it only requires that the bond be executed "to the other party." The reference therein to other persons interested in the subject matter is confined solely to the determination by the court of the *amount* of the bond, in order that it may be sufficient to indemnify other persons, not parties, who may be interested. Thus the Rule states that the plaintiff shall execute a bond: "* * * in such sum as the court or judge shall deem sufficient to secure the amount or other matter to be enjoined, and all damages that may be occasioned by such injunction or restraining order to the parties enjoined, or to any party interested in the subject matter of the controversy."

If the interpretation of the Springfield Court of Appeals is correct, it would mean that in every case where the possibility exists that other persons might subsequently join with the named defendants in willfully violating a restraining order, it would be necessary to write into the bond a provision that it was executed in favor of any person interested in the subject matter of

the controversy. It would also mean that without such a provision in the bond the transgressor, although he willfully violated the order, could not be punished by contempt. However, in Dillon, the court held that Mr. and Mrs. Dillon, though not served with a copy of the order, had actual knowledge of the order and that when they thereafter violated it, they were guilty of contempt.

■ This court need not rule upon this apparent conflict, for even if the Rule makes it mandatory for the plaintiff to execute the bond in favor of any interested party, as well as the named defendants, there is another rule of law which is applicable. There are innumerable cases which hold that where a bond is given in pursuance of a statute, courts in enforcing the bond will read into it the terms of the statute which have been omitted, and will read out of it terms included which are not authorized or required by the statute. People, to Use of Wilson v. Mosley, Mo., 263 S.W.2d 340 (a forthcoming bond given by an interpleader); State ex rel. Jefferson County v. Sheible, Mo., 163 S.W.2d 559 (a bond given by a county treasurer); State v. Vienup, 347 Mo. 382, 147 S.W.2d 627 (a bond given by a licensee under the Liquor Control Act); State v. Wipke, 345 Mo. 283, 133 S.W.2d 354 (same kind of bond); State v. Ruebling, Mo., 133 S.W.2d 360 (same); Fogarty v. Davis, 305 Mo. 288, 264 S.W. 879 (contractor's bond given school board); Zellars v. National Surety Co., 210 Mo. 86, 108 S.W. 548 (appeal bond); State ex rel. Sanders v. Hartford Acc. & Ind. Co., 235 Mo.App. 729, 143 S.W.2d 483 (security dealers bond); Rubelman Hardware Co. v. Greve, 18 Mo.App. 6 (injunction bond). Hence, if it was a mandatory requirement of the statute that the bond run to interested parties, the court may read into the bond that provision of the statute.

■ The petitioners then contend the bond is void because it was not approved or signed by the judge. The basis for this claim of invalidity is that the court wrote "8/30/63 Approved Michael J. Scott, Judge" on the power of attorney attached to the bond, rather than on the bond itself. No cases are cited in petitioners' memorandum in support of this contention, and careful research has failed to disclose any bearing directly on the question. However, there is no merit to the point. First, because Rule 92.09 does not require that the court approve the bond. Nor does Rule 92.10, which provides only that, " * * * the bond may be entered into before said clerk, if the court or judge granting the order or injunction shall first *approve the security.*" (Emphasis supplied.)

■■ There is a second answer to petitioners' contention. The court's record recites that the plaintiff presented the bond to the court, and that the court approved it. It has long been the rule in this state that a court speaks only through its records, which import verity, and cannot be impeached by extraneous evidence. In re Wakefield, 365 Mo. 415, 283 S.W.2d 467; Flansburg v. Kaiser, Mo., 184 S.W.2d 1004. Hence the record showing the court's approval of the bond is conclusive.

The last reason whereby the petitioners contend the bond is void is that alterations were made on its face which render it ambiguous. The only alteration made in the bond was that in the second paragraph where Cahill's name was crossed out, although it was allowed to remain in the first paragraph. Petitioners do not explain in their law memorandum why this alteration would render the bond null and void, nor can we conceive of any reason why this would be so.

■ Where two or more obligees are named in the bond, each has a separate right to recover thereon in the event of a breach. Helmkampf v. Wood, 85 Mo.App. 227. While it is the better practice for all obligees named in the bond to join in a motion for the assessment of damages, an obligee who has not been injured or damaged need

not join. Barrett v. Stoddard County, 272 Mo. 129, 197 S.W. 914. It follows that even if the bond may be said to be ambiguous as to Cahill, such ambiguity would not affect the rights of the other petitioners named therein. Since Cahill was not restrained, he could have no right to join in a motion for an assessment of damages. It is, of course, apparent that the failure to strike Cahill's name from the first paragraph was a mere oversight, and as stated earlier, the inclusion of his name may be treated as a superfluity. The petitioners' contentions with regard to the bond are without merit.

■ The petitioners' contentions with regard to the attachment are summarized in their contention that they were not sufficiently informed thereby of the specific charges placed against them. They contend that this lack of sufficient information constitutes a violation of due process of law as guaranteed by the 14th Amendment of the Constitution of the United States and also as guaranteed to them by Article I, Sections 10, 18(a), 19 and 21 of the Constitution of the State of Missouri. Sections 18(a) and 19 have to do with criminal proceedings and are not applicable to a proceeding for criminal contempt. Osborne v. Purdome, supra. Article I, Sec. 21, has to do with cruel and unusual punishment and will be discussed along with the other arguments advanced by petitioners with regard to their contentions that the sentences and fines imposed constitute cruel and unusual punishment. Article I, Section 10 of the Constitution of Missouri is what is generally known as the "due process law clause" of the Constitution and corresponds to the due process of law clause of the 14th Amendment of the Constitution of the United States. There is no merit to petitioners' contentions.

■ It is axiomatic that due process of law is not satisfied unless the party proceeded against is apprized of what is happening and is given an opportunity to defend (In re Barger, Mo.App., 365 S.W.2d 89). In a contempt case the alleged contemnor is entitled to a notice which fairly and fully informs him of the specific acts of contempt with which he is charged, and this notice must be given so as to afford a reasonable time to make his defense. G. v. Souder, Mo.App., 305 S.W.2d 883. The petitioners' contentions with regard to whether the time given them to prepare their defense was reasonable will be dealt with in connection with those petitioners whose applications are consolidated into cases 31,778 and 31,779 for the reason that there is no contention in this regard in the joint answer filed in 31,777. However, in all these cases it is alleged that the first element of due process, sufficient notice, is missing.

With reference to the petitioners whose applications were consolidated in 31,777, the application for the attachment set out in detail the activities of the petitioners which it was contended constituted willful and deliberate violations of the restraining order. These are the same charges as contained in the specifications found against these petitioners. As stated earlier herein that application prayed that the petitioners show cause why they should not be punished for said contempt. This application was granted, and an attachment order issued which called for the petitioners to be brought before the court on September 3. On the morning of that day counsel for all the petitioners were served with a copy of that application. At the request of the petitioners and to allow them to file their applications for writ of habeas corpus and prohibition in this court, the hearings were postponed until September 9th. Certain preliminary matters such as interrogatories and depositions not having been disposed of at that time the matter was passed, with consent of all parties, to September 23rd. On the 11th of September and again on the 18th of that month the petitioners were served with notice to show cause why they should not be punished "as for criminal contempt." The notice recited the restraining order in full and charged the petitioners with willful disobedience of that order in the manner set out in the specifications. On the 23rd

this notice was read to the petitioners in open court whereupon they plead not guilty and announced ready for trial.

With regard to the petitioners whose applications are consolidated into our files 31,778 and 31,779, the proceedings were begun by the filing of a motion. See Rule 92.15, V.A.M.R., Section 526.220 RSMo 1959, V.A.M.S. That motion set out in great particular the specific acts by which it was contended the petitioners there involved had violated the restraining order. Those acts are the same as contained in the specifications of the judgment entered as to each of these petitioners. The petitioners were each served with a copy of the attachment order which, as to those petitioners in 31,779, contains the specific charge that they were violating the restraining order by "physically hindering or interfering with persons desiring to enter or leave Jefferson Bank and Trust Company, standing, lying and sitting in said bank and thus interfering with normal conduct of said banking business, and standing and milling inside said banking premises and hindering and interfering with access by the public to plaintiff's banking facilities." As to those petitioners in 31,778, the attachment order served contains the specific charge that they were violating the restraining order by "standing in, lying in, sitting in, singing in, or walking in * * *" the bank. The petitioners were brought before the court, and counsel appearing for the petitioners in 31,777 entered their appearance. As provided by Rule 35.01(b), supra, the notice was given orally by the judge in open court reading the written notice to these petitioners. In each case after hearing evidence from witnesses who identified each of the petitioners and described conduct by each of them which would constitute a violation of the restraining order, the court entered an order to show cause setting out in detail the acts of the petitioner alleged to have been in violation of the restraining order, fixed a time and date for hearing, and admitted the petitioners to bail. Rule 35.01(b), supra.

In all three of the cases the petitioners have attacked the jurisdiction of the Circuit Court to issue the restraining order on the grounds that a "labor dispute" exists. Their contentions are that: (1) A labor dispute existed within the meaning and interpretations of the Federal statutes relating to labor relations; (2) By such statutes the Federal Government has preempted the field of labor relations and deprived the State courts of jurisdiction in such matters; (3) The evidence has not shown these cases to come within any of the exceptions to this rule which would permit the State court to exercise jurisdiction. These matters will be discussed in the order named.

Presumably the petitioners claim that a labor dispute arose, within the meaning of the Federal statutes, because of CORE's demand on the Jefferson Bank that it employ four Negroes as clerks or tellers, and the Bank's refusal to accede to its demand. The only Federal statute cited by the petitioners in their law memorandum is the Norris-La-Guardia Act, 29 U.S.C.A. § 101 et seq. Section 101 of that Act provides:

"*No court of the United States,* as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, *except in a strict conformity with the provisions of this chapter;* nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." (Emphasis supplied.)

The term "labor dispute" is defined in Section 113(c) as follows:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditons of employment, regardless of whether or not the dis-

putants stand in the proximate relation of employer and employee."

In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), cited by petitioners, a corporation composed of colored persons, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises, demanded that the grocery chain employ colored persons in managerial and sales positions in a newly-opened store. Sanitary Grocery refused, the Alliance picketed the store, and upon the petition of Sanitary Grocery the District Court of the District of Columbia enjoined the picketing. Pointing to subparagraph (c) of Section 113, as well as to subparagraph (a) which defines a case involving or growing out of a labor dispute, the Supreme Court said (303 U.S. 561, 58 S.Ct. 707, 82 L.Ed. 1012):

"The Act does not concern itself with the background or the motives of the dispute. The desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation. There is no justification in the apparent purposes or the express terms of the Act for limiting its definition of labor disputes and cases arising therefrom by excluding those which arise with respect to discrimination in terms and conditions of employment based upon differences of race or color."

Regarding the purpose of the Act, the court held (303 U.S. 562, 563, 58 S.Ct. 707, 82 L.Ed. 1012):

"The legislative history of the Act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act. It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices. The District Court erred in not complying with the provisions of the Act.

"The decree must be reversed, and the cause remanded to the District Court for further proceedings in conformity with this opinion."

■ Of course, as the underlined portion of Section 101 indicates, the prohibition against the issuance of restraining orders or injunctions in a case involving or growing out of a labor dispute applies only to a "court of the United States"; and does not limit the jurisdiction of state courts. In McCarroll v. Los Angeles County Dist. Coun. of Carpenters, 49 Cal.2d 45, 315 P.2d 322, 332 (1957), the Supreme Court of California states:

"The Norris-LaGuardia Act is in terms drawn as a limitation on the courts of the United States. 'No court of the United States,' declares section 1, 'shall have jurisdiction to issue any * * * injunction in a case involving or growing out of a labor dispute * * *,' and a court of the United

States is defined in section 13(d) as 'any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia.' 29 U.S.C.A. §§ 101, 113(d). The statute aimed to restrict the federal equity power, and was justified constitutionally on the basis of Congress' power to regulate the jurisdiction of the federal courts. Brotherhood of R.R. Trainmen v. Toledo, Peoria & Western R.R., 321 U.S. 50, 58, 63, 64 S.Ct. 413, 88 L.Ed. 534; Lauf v. E. G. Shinner & Co., 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872. It did not limit the remedial power of the state courts (see United Elec., Radio & Mach. Workers v. Westinghouse Elec. Corp., D.C.E.D.Pa., 65 F.Supp. 420, 422; General Bldg. Contractors' Ass'n v. Local Unions, 370 Pa. 73, 87 A.2d 250, 254, 32 A.L.R.2d 822; Markham & Callow, Inc., v. International Woodworkers, 170 Or. 517, 135 P.2d 727, 746, citing Frankfurter and Greene, The Labor Injunction at 220; 39 Ops.U.S. Atty.Gen. 242, 246), and could not constitutionally have done so since its prohibition was not restricted to injunctions in labor disputes affecting interstate commerce or any other subject over which Congress has paramount power."

Certiorari was denied, 355 U.S. 932, 78 S. Ct. 413, 2 L.Ed.2d 415.

 Furthermore, the Norris-LaGuardia Act does not prohibit even the Federal courts from issuing injunctions in *all* cases involving or growing out of a labor dispute. The jurisdiction of the Federal courts to continue to issue restraining orders and injunctions in cases where " * * * unlawful acts have been threatened and will be committed unless restrained, or have been committed and will be continued, unless restrained * * * " is recognized by Section 107 of the Act. Thus it has been held that the Norris-LaGuardia Act does not prevent a Federal court from restraining acts of violence. Brotherhood of Railroad Trainmen, Local Lodge No. 721 v. Central of Georgia Ry. Co., (4 C.A., 1956), 229 F.2d 901; Cater Const. Co. v. Nischwitz, (7 C.A., 1940), 111 F.2d 971; Grace Co. v. Williams, (8 C.A., 1938), 96 F.2d 478.

While the petitioners have not referred to it in their memorandum, there is another Federal measure which merits consideration, the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. In brief, that Act creates a Board and a General Counsel, Sec. 153; declares certain acts of an employer, and of a labor organization, to be unfair labor practices, Sec. 158; establishes procedures for the determination of an appropriate bargaining unit and the selection and certification of a collective bargaining representative, Sec. 159; and empowers the Board to prevent and enjoin the commission of unfair labor practices, Sec. 160. By Section 152(9) the term "labor dispute" is defined as follows:

"(9) The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

It will be noted that this definition of the term "labor dispute" is almost identical to that contained in the Norris-LaGuardia Act.

Other than the definition of the term "labor dispute," there is nothing in the Act which would support the claim that CORE's demand on the bank, and the latter's refusal to accede thereto, was an unfair labor practice, or otherwise constituted a violation of the Act. No case has been cited by petitioners, and none has been found, involving under the Labor Management Relations Act a factual situation similar to that in New Negro Alliance v. Sanitary Grocery, supra. However, in view of the similarity in lan-

guage between the pertinent provisions of the Norris-LaGuardia Act and that of the Labor Management Relations Act, the following statement by the Supreme Court of Pennsylvania in Navios Corporation v. National Maritime Union of America, 402 Pa. 325, 166 A.2d 625, 630, is significant:

> "The definition of labor dispute in the National Labor Relations Act is identical with the definition of labor dispute in the Norris-LaGuardia Act, except that the latter Act does not include the word 'tenure' and uses the conjunctive phrase, 'whether or not', instead of the more simple 'whether.' It follows, therefore, that if the facts of a case constitute a labor dispute within the meaning of the Norris-LaGuardia Act, they also constitute a labor dispute within the meaning of the National Labor Relations Act. * * *"

Certiorari was denied, 366 U.S. 905, 81 S.Ct. 1047, 6 L.Ed.2d 204, and rehearing denied, 366 U.S. 941, 81 S.Ct. 1658, 6 L.Ed.2d 852.

Petitioners then contend that the Federal Government has "preempted the field of labor disputes and thereby greatly limited the injunctive power of the State courts in area of labor disputes". If by "labor dispute" the petitioners mean an unfair labor practice, or a matter concerning the appropriate bargaining unit or the proper representative, as defined in the Labor Management Relations Act, petitioners' contention may be conceded. In Graybar Electric Co. v. Automotive, P. & A. I. Emp. Union, Local 618, 365 Mo. 753, 287 S.W.2d 794, decided in 1956, the Supreme Court en Banc reviewed the Federal decisions, Garner v. Teamsters, C. & H. Loc. Un. 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546, which excluded State courts from assuming jurisdiction of labor controversies that came within the ambit of the Labor Management Relations Act. In that case the employer sought to enjoin peaceful picketing on the grounds that it

was for the unlawful purpose of forcing the employer to coerce his employees into joining the Union, in violation of Section 29, Article I of our Constitution. The Union pleaded that if the employer's allegation was true, it constituted an unfair labor practice, and that the Labor Board therefore had exclusive jurisdiction of the case. Our Supreme Court concurred with this argument. In the later case of Swope v. Emerson Elec. Mfg. Co., Mo.1957, 303 S.W.2d 35, cert. den. 355 U.S. 894, 78 S.Ct. 268, 2 L.Ed.2d 192, fifteen former employees sued the employer for damages claiming that they had been discharged because of their union activities. The employer raised the defense that the allegation, if true, constituted an unfair labor practice, and that the Labor Board had exclusive jurisdiction. The Supreme Court agreed that the trial court had had no jurisdiction, and reversed judgments in favor of the former employees. For other cases holding that our State courts have no jurisdiction where an unfair labor practice is involved see Wolff v. Owsley, Mo.App., 332 S.W.2d 462; United Brick & Tile Division of American-Marietta Co. v. Wilkinson, Mo.App., 325 S.W.2d 50; Swift & Co. v. Doe, Mo.App., 315 S.W.2d 465, cert. den. 359 U.S. 911, 79 S.Ct. 587, 3 L.Ed.2d 574, cert. den. 359 U.S. 915, 79 S.Ct. 589, 3 L.Ed. 2d 577; McAmis v. Panhandle-Eastern Pipe Line Co., Mo.App., 273 S.W.2d 789.

It should be pointed out, in passing, that not every matter involving a labor organization or a matter of labor relations is necessarily an unfair labor practice or even a labor dispute of which the Board has exclusive jurisdiction. For example, see Adams Dairy, Inc. v. Burke, Mo. 1956, 293 S.W.2d 281, cert. den. 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323, where the purpose of the Union's informational campaign and boycott was enjoined as a concerted illegal activity because its sole objective was to injure the Company's business. It is also of interest to note that by Chapter 296, V.A.M.S. (Laws 1961, p. 439) the General Assembly has declared it to be an unlawful employment practice to discriminate

594

against any individual because of race, creed, color, religion, national origin, or ancestry; and has provided for the enforcement of its orders to cease and desist from any such discriminatory practice. In the light of this declared public policy, and in view of the decision of the Supreme Court of the United States in Hughes v. Superior Court of California for Contra Costa County, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985, it is at least doubtful whether the petitioners' demands for the employment of four Negroes, solely because of their race, may be considered a labor dispute. In that case, by repeated decisions, the Supreme Court of California had declared that discrimination in employment on the basis of color was against the public policy of that State. A group calling themselves Progressive Citizens of America demanded of Lucky Stores, Inc., that it hire Negroes at its grocery store, as white clerks quit or were transferred, until the proportion of Negro clerks to white clerks approximated the proportion of Negro to white customers, about 50%. Upon Lucky's refusal of the demand the store was picketed. Lucky obtained a temporary injunction against the picketing, the Supreme Court of California upheld it, and the Supreme Court of the United States granted certiorari.

Neither the Norris-LaGuardia Act nor the Labor Management Relations Act was mentioned in the Supreme Court's opinion, nor was the New Negro Alliance case, supra, cited. The question presented, in the court's words, was, "Does the Fourteenth Amendment of the Constitution bar a State from use of the injunction to prohibit picketing of a place of business solely in order to secure compliance with a demand that its employees be in proportion to the racial origin of its then customers? * * *" (339 U.S. 461, 70 S.Ct. 719, 94 L.Ed. 985). Holding that it does not, the Supreme Court said (339 U.S. l. c. 466, 70 S.Ct. l. c. 722, 94 L.Ed. 985):

"* * * We cannot construe the Due Process Clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy. * * *"

In any event, the irrefutable answer to petitioner's argument is that while the jurisdiction of state courts has been restricted by the Labor Management Relations Act, their right to enjoin violence and breaches of the peace has not been eliminated, which is all that was restrained in the instant case. This was recognized in Garner v. Teamsters Union, supra, where the Supreme Court of the United States said (346 U.S. 488, 74 S.Ct. 164, 98 L.Ed. 228):

"The national Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible.

"This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the State or it is entirely ungoverned.' In such cases we have declined to find an implied exclusion of state powers. International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 254, 69 S.Ct. 516, 521, 93 L.Ed. 651. Nor is this a case of mass picketing, threatening of employees, obstructing streets and highways, or picketing homes. We have held that the state still may exercise 'its historic powers over such traditionally local matters as public safety and order and the use of streets and highways.' Allen-Bradley Local No. 1111, United Electrical Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 749, 62 S.Ct. 820, 825, 86 L.Ed. 1154. * * *"

Our Supreme Court recognized this principle in Graybar Elec. Co. v. Automotive, P. & A. I. Emp. Un., supra, and in Swope v. Emerson Elec. Mfg. Co., supra. See also Angle v. Owsley, Mo.App., 332 S.W.2d 457.

There was sufficient evidence before the trial court upon which to issue the restraining order. Civil Rule 92, V.A.M.R., governs the issuance of restraining orders and injunctions. Rule 92.01 requires that a petition be filed, and, when the order or injunction is granted in vacation, it shall be signed by the judge or magistrate and returned together with the bond to the office of the clerk. Rule 92.02 provides:

"When it shall appear by the petition that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act of the defendant, the commission or continuance of which, during the litigation, would produce injury to the plaintiff, or when, during the litigation, it shall appear that the defendant is doing, or threatens, or is about to do, some act in relation to the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction or restraining order may be granted to restrain such act."

In this case, apparently, the restraining order was issued based on the bank's petition, verified by an affidavit, that these petitioners had threatened to physically hinder and interfere with the carrying on by the bank of its business, and that of its customers with it. As already indicated, violence, intimidation and similar acts may be restrained and enjoined even though they are threatened or committed in connection with a labor dispute. In that connection see also State ex rel. Allai v. Thatch, 361 Mo. 190, 234 S.W.2d 1 and Hamilton-Brown Shoe Co. v. Saxey, 131 Mo. 212, 32 S.W. 1106. Procedurally, the issuance of a restraining order on the strength of a verified petition and a bond received the court's approval in State ex rel. Allai v. Thatch, supra.

The last matter common to the answers filed by the petitioners in all three cases is that the fines and sentences imposed by the circuit court are such as to be held within the prohibition in the Constitution of the United States and the Constitution of Missouri forbidding cruel and unusual punishment.

Whether a punishment is cruel and unusual or inhuman is not an abstract question nor one to be decided upon precedent but is properly decided upon the facts of each case. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). In this case it is apparent from a consideration of the sentences that there has been no discrimination by virtue of race, color or creed in the punishment fixed by the circuit court. The activities of the petitioners found herein to constitute contempt go far beyond those areas of freedom of speech and peaceful assembly protected by the Constitution of the United States and of Missouri. It has been held that the First Amendment does not confer the right to persuade others to violate the law. Kasper v. Brittain, 6 Cir., 245 F.2d 92. So far as we are aware neither does any other provision of either constitution, nor does any provision of any document that embodies the governmental principles of a people who live by the rule of law. It should also be noted that we are not here dealing with uninformed, uneducated citizens unable to fully comprehend their nature and consequences of their acts. Of the nine petitioners whose applications are contained in 31,777, three are members of the bar, several are school teachers, one a minister, and one is an alderman of the City of St. Louis. Many of the remaining petitioners are students at the college level. The education level as well as the social and economic standing of these petitioners illustrates the deliberate, willful and contemptuous nature of their acts.

The petitioners would have this court reduce the amount of the fine and/or sentence in this habeas corpus proceeding. Ex parte Page, 49 Mo. 291, ruled this matter in 1872, and the same rule applies today. Petitioners have failed to cite any case to the contrary nor are we aware of any. Such an action would do violence to the historic purpose of writs of habeas corpus. We hold we have no authority, in a habeas corpus proceeding, to reduce the fines or sentences imposed, neither have we any authority to order the circuit court to do so. For the rule in other jurisdictions see 39 C.J.S. Habeas Corpus § 121.

As held herein these petitioners were found guilty of criminal contempt, and in such cases the punishment is punitive to vindicate the authority of the court and to uphold the majesty of the law. Section 476.120 RSMo 1959, V.A.M.S., provides that punishment for contempt may be by fine or imprisonment or both in the discretion of the court. Earlier statutes from which this section is derived limited imprisonment for contempt to a $50.00 fine, or 10 days in jail, or both. See Laws of Missouri, 1919, p. 271; see also the dissent of Lamm, J., in Chicago, B. & Q. Ry. Co. v. Gildersleeve, 219 Mo. 170, 118 S.W. 86, which dissent finally became the law in Ex parte Creasy, supra. The only purpose the legislature could have had in removing these limits was to evidence their intent to leave to the courts the matter of punishment suitable to the severity of the offense involved in each case.

Section 476.110 RSMo 1959, V.A.M.S., is essentially the same as that found in 18 U.S.C.A. § 401(3). Under the Federal practice imprisonments for terms of from 1 to 4 years have been upheld upon convictions for contempt as being neither abuses of discretion nor cruel and unusual punishment within the meaning of the Eighth Amendment which in substance is the same as Art. I, Sec. 21, Constitution of Missouri. Brown v. United States, 359 U.S. 41, 79 S. Ct. 539, 3 L.Ed.2d 609; United States v. Thompson, 2 Cir., 214 F.2d 545. United States v. Hall, 2 Cir., 198 F.2d 726, 34 A.L.R.2d 1088. With respect to the extent of the fine imposed, in United States v. United Mine Workers of America, 330 U.S. 258 at 303, 67 S.Ct. 677 at 701, 91 L.Ed. 884, it was held:

"* * * In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. *Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.*" (Emphasis supplied.)

In Osborne v. Purdome, supra, the sentence was for 10 months and the fine assessed was fixed at $1,000.00. We hold that the fines and sentences imposed upon these petitioners are not in violation of the provisions of the Constitution of the United States and of the State of Missouri prohibiting cruel and unusual punishment.

We pass now to a consideration of the proceedings with regard to the petitioners whose applications for our writ we have consolidated in file 31,778 and whose alleged contempt occurred next in point of time. What had taken place to cause the motion for attachment to be filed is perhaps best stated in the following excerpt from the petitioners' brief: "On Friday, October 4, 1963 the petitioners herein went to the Jefferson Bank and Trust Company and entered said bank carrying signs pinned or fastened to them reading '4 JOBS'. Inside the bank they sang freedom songs, locked arms, sat and stood in front of the entrances of said bank. While petitioners were inside said bank, an official of the bank read to them a copy of the restraining order dated August 30, 1963. The

petitioners had not prior to that time been served with a copy of the restraining order. After said order was read by the official of the bank, a request was made to petitioners to leave the bank. The petitioners refused to leave the bank. There were on hand police officials who promptly arrested petitioners and placed them in custody, removed them bodily from the bank to the police headquarters. They were all charged with peace disturbances and with trespassing. The arrests and placing petitioners in custody took place between 4:00 p. m. and 6:00 p. m. on Friday, October 4, 1963."

These proceedings were begun on October 4, 1963 by the filing of a pleading styled "Motion for Issuance of Attachment for Contempt Pursuant to Rule 92.15 and Section 526.220 Revised Statutes of Missouri 1959." This motion was filed in the same action and under the same heading as the original proceeding for the restraining order and injunction. By that motion the bank moved for the issuance of an attachment of the bodies of the petitioners Goins, Lee, Glenn, Jones, Ford, Grand, Roberta Tournour " * * * and other person or persons unknown for the violation of the temporary restraining order issued by this Court on August 30, 1963 (which is now in full force and effect) by physically hindering and preventing customers of the plaintiff and other members of the public from customary access to tellers' windows by locking arms in front of the doors of plaintiff's place of business, or sitting in, lying in, standing in or singing in plaintiff's place of business and thereby interfering with plaintiff's business or by harrassing (sic) plaintiff's employees or customers in front of, around or in plaintiff's place of business." Proof of service of the attachment order on each of these petitioners was filed on October 4th.

Upon their arrest, the petitioners were taken forthwith before the Judge of Division No. 2 of the Circuit Court. After the petitioners were brought into the courtroom, Mrs. Wilson, Mrs. Younge, and Messrs. Cahill, Wilson and Ratermann entered their appearances for all the petitioners. The transcript shows that in open court the trial judge read the motion for attachment, the temporary restraining order and the order of attachment to the petitioners. Evidence was presented by 3 witnesses that these 7 petitioners were inside the bank, blocking the exits and doing other things in violation of the restraining order; that the restraining order was read to them by an officer of the bank; and that these 7 petitioners refused to leave but continued their acts of violation of the restraining order. Counsel for the petitioners offered no testimony, although participating in cross-examination of these witnesses. The court then entered its order setting bond for five of these petitioners in the amount of $1,500.00 each and for 2 of them in the amount of $5,000.00. It further ordered " * * * that said alleged contemptors (sic) be and appear in this Court and in Division Number 2 thereof on Monday, October 7th, 1963 at 10 o'clock A.M., and there and then to show cause, if any, why they should not be punished for contempt of Court in violation of the Court's restraining order heretofore issued the 30th day of August, 1963."

At the proceedings on October 7th, the petitioners were represented by the same counsel who appeared for the petitioners whose applications are consolidated in 31,777. Counsel for petitioners requested a continuance of 3 weeks. The trial court denied the motion for a continuance, and the petitioners requested time to apply to this court for a writ of prohibition. This was granted, the writ filed, and upon its denial and counsel's return to the circuit courtroom, the court asked, "Are you ready, gentlemen?" The transcript discloses that Mr. Wilson, counsel for petitioners, stated, "We are ready, Your Honor."

Trial then proceeded over a period of several days, concluding on the 11th of October. Nineteen witnesses were called by the plaintiff and each of the petitioners testified in his or her behalf. Guardians ad Litem were appointed for the petitioners Glenn, Lee, and Tournour upon the discov-

ery that they were minors. At the close of the evidence against petitioners, their counsel moved for a directed verdict or an "acquittal." This motion was renewed at the close of all the evidence, and was overruled by the court.

On October 25, 1963, the court entered its findings of fact and judgment as to each of these petitioners which are all very similar. The court recited the proceedings of October 4th as herein stated, found that each petitioner was present at the trial, represented by counsel, and had presented evidence in his or her behalf. The restraining order is then set out in full. The court also found that each of these petitioners had actual knowledge of the temporary restraining order by reason of having it read to them on October 4th. The petitioners were each found to have willfully disobeyed and violated that restraining order by:

"(1) Entering the banking premises of Jefferson Bank and Trust Company and standing, sitting, and lying in front of the entrance to said bank, thereby physically hindering, obstructing, interfering with and harassing persons desiring to enter said bank's premises for the purpose of conducting their business.

"(2) Congregated and loitered individually and in a group inside said bank, thereby interfering with, hindering and annoying persons in the conduct of their business with said bank.

"(3) While inside said bank, and acting as aforesaid, and after said Restraining Order was read to him, the defendant, having been requested to leave said bank, refused to do so, thereby interfering with the proper and normal conduct of the business of Jefferson Bank and Trust Company.

"It is further found, adjudged and decreed that the aforesaid acts and conduct constitute offenses against the majesty of the law and the dignity and authority of this Court.

"It is further found, adjudged and decreed that defendant LOUIS FORD is guilty of willful disobedience of said Temporary Restraining Order, and is punishable as for criminal contempt."

Each of the petitioners received a fine of $500.00 and jail sentences as follows: Goins, 90 days; Lee and Glenn, 60 days; Jones and Ford, one year; Grand, 180 days; and Mrs. Tournour, 120 days. Each was also to pay one-seventh of the costs.

The recitals of the judgment entered as to each of the seven petitioners whose applications are consolidated into 31,778 are such that the facts need only briefly be referred to. This is for the reason that each of these petitioners, then having notice of the restraining order, were found to have: (1) entered the bank and to have stood, sat or lain in front of the entrance to the bank thereby physically hindering, obstructing and interfering with persons desiring to enter the bank to conduct business therein; (2) to have congregated and loitered inside the bank and thereby to have interfered with, hindered and annoyed persons conducting business with the bank; and (3) to have refused to leave the bank after the restraining order was read to them and upon being requested to do so thereby interfering with the proper and normal conduct of the business of the bank. It is obvious that these acts, if found to have been committed, constituted violations of paragraphs (a), (b), and (c) of the restraining order as that order is set out earlier herein.

In that portion of their brief recited earlier in this opinion the petitioners admitted they went into the bank; that while they were inside, they sang, locked arms, sat and/or stood in front of the entrance to the bank; that "While petitioners were inside the bank an official of the bank read to them a copy of the restraining order dated August 30, 1963; that after this order was read to them they were requested to leave the bank"; and that "The petitioners refused to leave the bank." We need not rule

whether these admissions in the brief are sufficient, for they constitute uncontroverted facts. The petitioner Ford testified he went into the bank and stood and sat in front of the doors. He also identified himself in one of the exhibits which shows that petitioner linking arms with others and effectively blocking a doorway. Perhaps his testimony can best be summed up by this excerpt: "Q. Which doors did you stand in front of the bank that day, sir? A. I tried to stand in front of all of them. Q. Which doors did you sit in front of? A. The front door. Q. Which doors did you lie down in front of? A. I tried to lie down in front of all of them." There was evidence that his attempts to block all the entrances were successful. He also identified the petitioner Jones in an exhibit which shows that petitioner blocking an entrance to the bank. Jones testified: "A. Well, I sat in front of the door, stood in front of the door and I sang. * * * Q. And which one of the doors did you sit at, stand at and sing at? A. I sat in the front door on the Washington side, I stood at the door, at the entrance to the savings and loan and I stood in front of the service entrance door." This petitioner also admitted the correctness of Ford's identification of him in the exhibit showing him blocking one of the entrances and, in turn, identified Ford in the exhibit showing that petitioner blocking one of the entrances. Both Jones and Ford admitted they had to be carried out of the bank. The petitioner Tournour admitted she both stood and sat in front of entrances to the bank and identified herself in an exhibit showing her locked arm in arm with others later identified as the petitioners Goins, Lee, Glenn and Grand and blocking an entrance to the bank. She also had to be carried from the bank. The petitioner Glenn testified as follows: "Q. What did you do now after you got there? A. I went inside the bank, sir. Q. You went inside the bank? A. Yes, sir. Q. What did you do inside the bank? A. I demonstrated by singing, sitting and standing. Q. And where did you stand in the bank? A.

At the south door. Q. At the south door. Is that the only door at which you stood? A. Yes, sir. Q. Where did you sit in the bank? A. At the north and south door. Q. You sat at the north and the south doors? A. Yes, sir. Q. And you stood at the south door; is that right? A. Yes, sir." This petitioner also identified himself in another photograph showing him blocking an entrance to the bank. The petitioner Lee admitted that he sat and stood in entrances to the bank and that he sang while in the bank stating that he did so with the purpose of " * * * using my person to make it inconvenient for people to enter the bank." The petitioner Ian Grand admitted he went inside the bank and joined a line of people blocking an entrance. The petitioner Goins identified himself in a line blocking the door in an exhibit showing himself, Mrs. Tournour, Glenn, Lee, and Grand blocking an entrance. This petitioner testified he went into the bank to close an account he had there but rebuttal evidence and exhibits proved that no balance had been in this account since September 25th. The witnesses Norton, Eitzman and Matteson identified the petitioners as shown in the various exhibits and testified they saw them in the various poses before the entrances as portrayed by the exhibits. The witness Matteson also identified the petitioner Ford lying in front of one of the entrances as shown in a photograph admitted into evidence. The effect of the testimony of these witnesses was that they heard Mr. McConnell read the injunction to the petitioners and heard him ask the petitioners to leave the bank. The sound movies admitted into evidence proves the reading of the injunction and the request that the petitioners leave the bank. The witnesses Steck, Mrs. Hendrickson, Smith, Mayo, Mrs. Lay, Elrod, and Dorris Esparcia each testified that they attempted to get in or out of the bank on October 4th in order to transact business and either could not or did so at great personal inconvenience and some physical danger. The witness Esparcia had to crawl between the

legs of two of the demonstrators to get out of the bank. The witness Mayo had to force his way in and then force his way back out. Other witnesses had to step over the demonstrators to get in or out of the bank. Mr. Ross, president of the bank, testified that he saw some people known to him to be customers of the bank outside the bank and unable to get in.

■ This evidence sustains the finding these petitioners had actual notice of the restraining order. The evidence also sustains the finding that these petitioners were guilty beyond a reasonable doubt of violations of paragraphs (a), (b), and (c) of the restraining order as found in the specifications set forth in the judgment entered as to each petitioner.

These petitioners also contend that they were denied counsel while in custody, that the bail fixed by the court was excessive, and that they were afforded an inadequate time to prepare their defense.

The contention that these petitioners were denied the opportunity to consult with counsel is without merit. It is unsupported by the allegation of any factual matters which might go to prove its veracity. Moreover, no such facts appear in the transcript. What does appear plainly in the transcript is that five counsel who represented petitioners were present in the courtroom when they were brought before the court. The petitioners were represented by these members of the bar in the proceedings that then took place from the very inception of those proceedings. In view of the admissions of guilt made by each of these petitioners, it is difficult to ascertain how this contention, assuming it to be true, could prejudice the petitioners.

■ The court heard testimony which strongly indicated that these petitioners had willfully and deliberately violated the restraining order. It issued an order to show cause why the petitioners should not be punished as for criminal contempt and, in

accordance with Rules 35.01 and 92.15, supra, fixed the bail of 5 of the petitioners at $1,500.00 each and 2 of them at $5,000.00. It requires no citation to substantiate that the amount of bail is discretionary with the court. It should be remembered that these petitioners were alleged to have violated this injunction immediately after completion of two weeks of trial on the violations by those petitioners whose applications are consolidated into 31,777. This trial had been widely publicized. In view of the alleged violation of these petitioners immediately following that matter the trial court cannot be held to have abused its discretion in ordering bail to be fixed at $1,500.00. With respect to the two petitioners, Mr. Ford and Mr. Jones, whose bail was fixed at $5,000.00 each, the evidence is that Jones was a nonresident and Ford had testified in the trial which the judge had just concluded that he had violated the injunction on that occasion also. There is no merit to this contention.

■ The petitioners then contend that they were denied an adequate time to prepare their defense in violation of the due process clause of the Fourteenth Amendment. As stated earlier herein when dealing with the petitioners' contentions with regard to a lack of due process as to the attachment proceedings, an alleged contemnor is entitled to a notice which fairly and fully informs him with what he is charged and given him so as to afford a reasonable time to prepare his defense. G. v. Souder, supra. In the instant case counsel for the petitioners announced ready for trial after his application for a writ of prohibition was denied. The petitioners have failed to allege in their answers or state in their brief any facts that would lead to any reasonable conclusion that they were in fact prejudiced by going to trial on October 7th. As stated earlier herein each of the petitioners took the stand and in fact admitted his or her guilt. There was no real controversy as to what had occurred. Under such circumstances there is no merit

to the contention they were denied due process of law in that they were deprived of an adequate time to prepare their defense.

■ These seven petitioners raise a contention with regard to the restraining order being void which is not contained in either of the answers filed in 31,777 or 31,779. They contend the restraining order was void as to them because there was no service of that order upon them. The general rule is that if a defendant has knowledge of the issuance of an injunction or restraining order, he will be bound thereby as though it had actually been served. 43 C.J.S. Injunctions § 208. Engel Sheet Metal Equipment, Inc., v. Shewman, Mo. App., 307 S.W.2d 694, and cases cited therein at l. c. [2], p. 696. In the instant case there can be no question but what the petitioners had knowledge of the temporary restraining order and of its specific provisions. A copy of that order was read to them by Mr. McConnell, while they were in the bank. The moving pictures introduced into evidence so show and numerous witnesses so testified that they observed and heard McConnell read the restraining order. Certainly, the petitioner Ford had excellent knowledge of that order, for he had been a witness in case 31,777. There is no merit to this contention.

The evidence as to the petitioners Michela Grand, Pollack and Peake can best be understood if one keeps in mind the general situation shown to have existed at the bank on October 7, 1963. As stated earlier herein, the bank had made certain additional preparations in advance of the demonstration occurring on that day. An officer of the bank was stationed at each entrance to the bank along with a bank guard. The doors were to be opened only to persons recognized as customers of the bank or to those who stated they had business with the bank or wished to become customers. It appears that one method the demonstrators had used in the previous demonstrations was to line up before the tellers' cages and change coins and bills into coins of smaller denomination. The bank had designated one teller's cage, No. 10, as a change window and had put up a sign so signifying. In addition, the signs stated that a charge of 25¢ was to be made for each transaction to those not customers of the bank. Large printed signs had been posted on every door opening into the bank, in the lobby, and at four positions outside the bank. These signs had red lettering which read, "Warning to all Demonstrators" followed by slightly smaller black lettering stating: "The following Court Order has barred any interference with the business of this bank." Photostats or some similar reproductive process of the restraining order were attached to the sign. Ten such signs were posted. In addition, the bank had caused a public address system to be installed with three speakers outside the building and two inside. An assistant vice president was stationed at the microphone, and a statement was prepared for him to read at certain intervals. That statement was read repeatedly during the demonstration of October 7 and could be clearly heard inside and outside the bank building. In essence, the statement recited that the restraining order which had been issued barred any interference with the business of the bank. It warned that entry into the bank would subject a person to arrest if he was not a customer of the bank. It asked all those in the bank not transacting business with the bank to leave and warned again of arrest if any failed to do so. In addition to these measures, the bank had arranged with the Sheriff's office that two or three deputy sheriffs be present and that they have copies of the restraining order with them for service upon any who violated the terms thereof. In spite of these measures, the demonstration progressed to a point where there were people in the bank sitting and/or lying in front of the tellers' cages as well as others outside the bank who were lying underneath or in front of vehicles stopped near the bank so that those vehicles could not be moved.

These proceedings were begun in the same manner as they were in the cases of

the petitioners just previously discussed and, as was true in that proceeding, were filed in the case of the original restraining order and injunction. A motion for the issuance of attachment for contempt was filed with the circuit court listing these three petitioners and two others not here involved and requesting the court order then attached.

" * * * for violation on October 7, 1963 of the Temporary Restraining Order issued by this Court on August 30, 1963 (which is in full force and effect), in one or more of the following respects:

"(1) Physically hindering and preventing customers of plaintiff and other members of the public from entering and leaving plaintiff's place of business by locking arms in front of entrances.

"(2) By entering said banking premises and setting (sic) in, lying in, standing in, milling about, and singing and chanting therein, and thereby interfering with the proper and normal conduct of plaintiff's banking business.

"(3) Standing and loitering in front of tellers' windows so as to prevent customers of plaintiff's bank from utilizing the facilities for the conduct of their proper and normal business with the plaintiff.

"(4) Harrassing (sic) plaintiff and hindering and interfering with the proper and normal conduct of plaintiff's business by entering said bank for the purpose of making change which purpose was solely to harrass (sic) plaintiff and interfere with the normal conduct of its business.

"(5) Harrassing (sic) plaintiff and hindering and interfering with the proper and normal conduct of plaintiff's business by entering said bank for the purpose of becoming customers of the bank which purpose was solely to harrass (sic) plaintiff and interfere with the normal conduct of its business.

"(6) Refusing to leave plaintiff's banking premises after having been requested to do so, and by so refusing to harrass (sic) plaintiff and interfere with the normal conduct of plaintiff's business."

The court's order also shows that it appointed Messrs. Millsap and Montrey "to present evidence of contempt." Mrs. Younge and Mr. Jones entered their appearances for these petitioners on the same day. The attachment was issued and the Sheriff brought these petitioners forthwith before the court. The court read the notice to the petitioners. It contains the same specifications as set out above from the motion, and concludes: " * * * The foregoing charges and specifications constitute offenses against the majesty of the law and the dignity and authority of this Court and you are hereby punishable for criminal contempt." The trial of the petitioners of No. 31,778 was then in process and the trial of these petitioners was continued from time to time until October 14th when the trial began.

Before trial began on the 14th of October, a Guardian ad Litem was appointed for the petitioners Pollack and Michela Grand, they having been found to be minors. Among other pleadings and motions filed that day on petitioners' behalf was a joint return to the order to show cause for contempt. The petitioners filed a motion for a continuance, to dismiss, and for a severance. These motions were overruled and their counsel announced, "We are ready to proceed, Your Honor." The trial was concluded on October 16th and the court announced that it would render judgment on October 25th.

In the judgment entered as to each of these petitioners, the restraining order is set out, a finding made that it was in full force and effect when the acts by these petitioners occurred, the appearance of the petitioners before the court on October 7th is recited, and the notice read to the petitioners in open court is set out in full. As

to the petitioners Michela Grand and Daniel Pollack, the court proceeded to find as follows:

"It is further found that Michela Grand was aware of and had actual notice of the issuance of the Court's Restraining Order prior to her entry into the banking premises on October 7, 1963, as hereafter found; such actual notice was received by the said Michela Grand by being outside the premises of the Jefferson Bank and Trust Company on October 7, 1963, when notices concerning said Restraining Order were read over a public address system there at said bank; further, that copies of said Restraining Order were posted about the premises of the bank in such positions that the said Michela Grand saw or should have seen the same; further that while the said Michela Grand was inside the banking premises on October 7, 1963, a copy of the Court's Restraining Order was given to her by a Deputy Sheriff of this Court."

The court found that these petitioners had willfully disobeyed and violated the restraining order by:

"(1) Harrassing (sic) plaintiff and hindering and interfering with the proper and normal conduct of plaintiff's business by entering said bank for the purpose of making change, which purpose was solely to harrass (sic) plaintiff and interfere with the normal conduct of its business.

"(2) Refusing to leave plaintiff's banking premises after having been requested to do so and by so refusing to harrass (sic) plaintiff and interfere with the normal conduct of plaintiff's business.

"(3) By entering said banking premises and lying in said premises and thereby interfering with the proper and normal conduct of plaintiff's banking business."

These acts and conduct were found to constitute offenses against the majesty of the law and the dignity and authority of the court. These petitioners were found guilty of willful disobedience of the temporary restraining order and were to be punished as for criminal contempt.

The judgment entered as to the petitioner Peake differs only in the fact that he was not found guilty of the last specification; that of entering the bank premises and lying in them, thereby interfering with the proper and normal conduct of the bank's business.

Each of these petitioners received a different sentence. The petitioner Michela Grand received 120 days; Pollack received 60 days; and Peake received one year in jail. Each also received a fine of $500.00 and was to pay one-third of the costs.

Each of the petitioners Michela Grand, Pollack, and Peake were found to have had actual notice of the issuance of the restraining order prior to his or her entry into the bank on October 7th. This finding is amply supported by the evidence. As stated, the statement warning demonstrators against entering the bank was repeatedly read over the public address system and the testimony and photographic exhibits show that one could not enter the bank without seeing one or more of the signs containing the restraining order itself. Moreover, Michela Grand can reasonably be held to have had notice from the fact that her husband, Ian Grand, was arrested earlier along with those petitioners whose applications for habeas corpus are consolidated in 31,778 and dealt with earlier herein. The petitioner Peake was shown to have been in court during some of the proceedings regarding the trial of those who had earlier committed acts the trial court found contemptuous. In addition to the above evidence, there was testimony that each of the petitioners was served with a copy of the restraining order while he or she was in the bank on October 7th and prior to their arrest on that date.

The petitioners Michela Grand and Danny Pollack were found to have violated the restraining order by: (1) entering the bank for the sole purpose of making change in order to harass the bank and interfere with the normal conduct of its business; (2) refusing to leave the bank after being requested to do so and by so refusing to harass the bank and interfere with the normal conduct of its business; and (3) to have entered the bank and to have lain down therein, thereby harassing the bank and interfering with the normal conduct of its business. The petitioner Peake was found to have violated the restraining order in only the manner charged in (1) and (2) above. There can be no doubt that a person found to have done any one of these three acts would be in violation of paragraphs (b) and (c) of the restraining order as those paragraphs are set out earlier herein.

The evidence as to Michela Grand was that she came into the bank at about 4:50 P.M. and walked up to the line in front of teller's window No. 10. By the time she reached the window there was a line of 7 or 8 people in back of her waiting to get to this window. When her turn came, she stood there for several minutes and was then asked to leave the bank. She made no reply, whereupon a deputy sheriff served her with a copy of the restraining order. She was again asked to leave the bank and was told that if she continued to stand in front of the cage, she would be arrested. She again made no reply but sat down on the floor in front of the tellers' cages with her back to the counter. During this time the statement previously referred to was read over the public address system at least once. It had also been read prior to her entry into the bank and carried over the outdoor speakers beginning at 4:30 P.M. This petitioner remained on the floor for some 10 to 15 minutes, either sitting down or in a prone position. During this time, she was asked to leave the bank and refused to do so. She was put on a stretcher and moved out of the bank. Photographs were introduced into evidence showing this peti-tioner in several positions on the floor of the bank and also as she was put on the stretcher and carried from the bank.

The evidence as to the petitioner Pollack is very similar. He entered the bank and went to window No. 10. When he reached the teller he stood before the cage. There were people in line behind him. After this continued, he was told that he would have to move; that he could not block the teller's window. The petitioner made no reply and continued to stand in the same position. He was then served with a copy of the re-straining order. While this petitioner was standing in front of the teller's window, the statement warning the demonstrators was read over the public address system. He was then told that if he continued to block the window, he would be arrested. The petitioner then sat down on the floor and remained on the floor until he was carried out. Photographs introduced into evidence show Pollack on the floor, being put on a stretcher, and also being carried from the bank.

The petitioner Peake made 2 appearances in the bank. The first time he came in at about 4:40 p. m. Peake is a paraplegic and was pushed in his wheelchair up to window No. 10. He offered a $1.00 bill and was given change. He stayed there for a short time even though others were then trying to get change and then left the lobby of the bank. At about 4:55, Peake came into the lobby again. On this occasion he located himself in about the center of the lobby, where he was interviewed by representa-tives of news media. While Peake was in the approximate middle of the lobby, the statement warning of the issuance of the restraining order was read over the loud-speakers. While he was in that same posi-tion, several officials of the bank and at least one police officer had conversations with him. The witness Houston, an official of the bank, asked Peake if he had any business with the bank. Peake replied that he had none but wanted to look around. Houston then asked this petitioner if he was a demonstrator to which Peake replied

that he was. Houston then asked him to leave the bank and Peake refused to leave. Peake was then served with a copy of the restraining order. Mr. Ross, an officer of the bank, told Peake the bank did not want him as a customer and asked him to leave. He replied "I won't go." Peake was then warned of his arrest if he did not leave, and Peake replied "That is fine, arrest me and arrest this man behind me too," pointing to the man pushing his wheel chair. The witness Eitzman, a police officer, testified that he asked Peake if he had any business in the bank and that Peake replied he had none. Major Eitzman then told him that the bank had complained about his loitering in the lobby and asked him to leave. Peake again refused to leave.

The petitioners did not take the stand nor did they offer any testimony. Their entire defense was developed by their counsel in cross-examination of the witnesses offered by their opponents. This defense took three principal courses. First, that there were too many policemen and deputy sheriffs at the scene of the demonstration. Second, was the contention that the demonstration was justified. To develop this point, they asked questions of Mr. Ross, an officer of the bank, such as "Do you believe that every man should have a decent job, Mr. Ross?" Another witness was asked if it was true that James Peake had said that " * * * nonviolent civil disobedience was justified in the best tradition of Christ, Thoreau, Gandy (sic) and Martin Luther King; * * *" The other defense which they attempted to establish by cross-examination dealt with the fact that the bank was charging a service fee of 25¢ when it made change for those not regular customers of the bank. There was repeated cross-examination as to whether the bank was obliged under its charter and/or by the regulations under which it operated to exchange money without a service fee to anyone who requested it. There was no evidence offered on this matter. The bank's charter or the regulations referred to were never offered as evidence nor in any way

proved. Of course, the question immediately arises as to whether these petitioners are the proper parties to enforce such regulations, if any do in fact exist. We do not deem it necessary to rule the point, for assuming the petitioners to be proper parties to enforce such regulations in this proceeding, the pertinence of these defenses in a proceeding wherein the petitioners are charged with willful and deliberate violations of a lawful restraining order is too nebulous to be given greater consideration than it has been herein accorded.

■ The evidence sustains the finding that these petitioners had actual notice of the restraining order. The evidence also sustains the finding that the petitioners Michela Grand and Daniel Pollack were guilty, beyond a reasonable doubt, of violations of paragraphs (b) and (c) of the restraining order as found in all three of the specifications contained in the judgment entered as to those 2 petitioners and the finding that the Petitioner Peake was guilty beyond a reasonable doubt of violations of paragraphs (b) and (c) of the restraining order as found in both of the specifications contained in the judgment entered as to that petitioner.

At this point, it is appropriate to dispose of the contention advanced by these petitioners that they are "business invitees" and not in violation of the court's order when they entered the bank. Several answers to this contention readily spring from the factual statement above. The simplest of these it is apparent from the facts that two of these petitioners entered the bank without any real purpose of transacting business therein and, in fact, did not even attempt to transact even the business of getting change. Peake did present a dollar bill to be changed on his first trip into the bank, but made no attempt to do so on his second trip. Moreover, whatever benefit these petitioners could derive from the characterization of "business invitees" upon entering the bank was certainly lost to them by their departure from that characteriza-

tion when they refused to leave the bank when repeatedly requested to do so and when they conducted themselves while in the bank in the manner shown by the evidence.

The contention advanced as to the appointment of special prosecutors in 31,779 is the same as that made with regard to the petitioners whose applications are consolidated into file 31,777, and the ruling there stated is equally applicable to that contention as made by these three petitioners. With regard to the restraining order, the contentions that were contained in the joint answer filed in 31,779 and the ruling on the point made earlier herein applies as well to these three petitioners. The petitioners whose applications were consolidated into 31,779 also contend that due process of law was denied them in that they were not granted an adequate time to prepare their defense. The principles of law stated earlier herein when this same contention was advanced by those petitioners whose applications are contained in 31,778 are equally applicable to the petitioners here involved. Of course, the evidence differs somewhat. With regard to the petitioners whose applications were consolidated into 31,779, the evidence is that their counsel announced ready for trial upon the court overruling the motion for a continuance. These petitioners fail to allege in their answer or state in their brief any facts which would lead to the conclusion that they were denied due process by the court's action in proceeding to trial after their counsel announced ready. In view of the overwhelming evidence as to the guilt of these petitioners we cannot find them prejudiced by that action. There is no merit to this contention.

It follows from what has been herein held that the petitioners Curtis, Clay, Seay, Richards, Perkins, Ford, Ian Grand, Goins, Tournour, Jones, Lee, Glenn, Michela Grand, Pollack, and Peake are not illegally restrained, and as to these petitioners our writs should be quashed and these petitioners remanded to the custody of the respondents. As to the petitioners Howard, Thompson, Marian Oldham, and Charles Oldham, we hold they are illegally restrained in that the evidence does not support the finding that they were guilty, beyond a reasonable doubt, of any of the specifications found in the judgment entered as to each of them. Accordingly they are to be discharged forthwith.

All concur.